AUGUST STUMPP and Another, Copartners, Doing Business under the Firm Name and Style of AUGUST STUMPP & COMPANY, Appellants, *v.* THE BANK OF NEW YORK, NATIONAL BANKING ASSOCIA-- TION, Respondent.

First Department, May 1, 1925.

Banks and banking — depositors — action by depositor to recover amount paid by bank on forged checks — forgeries extending over period of more than two years were committed by depositor's employee who had authority to receive canceled vouchers from bank — concealment of forgeries was effected by employee by entering less on check book than deposited and drawing out balance on forged checks which were not listed in check book — canceled forged checks were taken by employee from valid canceled checks before canceled checks we**re** given to employer — ordinary care required depositor to compare canceled checks with stubs and with bank's list of checks paid and to compare balance on statement by bank with balance in check book — comparing canceled checks with stubs and adding unpaid checks to balance shown in check book and comparing result with bank's balance not ordinary care — bank is not liable.

In an action by a depositor to recover money paid by his bank on forged checks, the forgeries extending over a period of more than two years, it is incumbent upon the depositor to show that he used ordinary care to ascertain whether or not any canceled checks returned to him by the bank were forged, and ordinary care requires the depositor to compare the canceled checks with the stubs in his check book and with the statement returned by the bank with the canceled checks which contains a list of checks paid by the bank, and also to compare the balance shown on the bank's statement with the balance shown on the check book.

Accordingly, a depositor cannot recover the amount paid by his bank on checks forged by an employee of the depositor who had authority to receive canceled vouchers from the bank, and for the purpose of concealing the forgeries entered on the check book less money than was actually deposited, and withdrew from the bank the difference by forged checks that were not listed in the check book, where it appears that when the canceled vouchers were received by the dishonest employee he withdrew the forged checks and turned the valid checks over to his employer, and that the employer merely compared the canceled checks given to him by his employee with the stubs in the check book and then added to the balance shown in the check book the amount of unpaid checks and compared that result with the balance shown on the bank's statement returned with the canceled vouchers. The depositor failed to use ordinary care by not comparing the list of checks paid by the bank with the canceled checks actually delivered to him by his employee.

APPEAL by the plaintiffs, August Stumpp and another, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of New York on the 28th day of April, 1924, upon a verdict rendered at the New York Trial Term

pursuant to a stipulation that the action be tried without a jury and that a verdict be directed with the same force and effect as though a jury were present.

*Duer, Strong & Whitehead* [*Selden Bacon* of counsel], for the appellants.

*Karl T. Frederick* of counsel [*John Schubert* with him on the brief], for the respondent.

DOWLING, J.:

This is an action by the appellants as depositors to recover a sum of money claimed to have been paid from their account by the respondent bank on forged checks. The bank pleaded as a defense to the first two checks that notice of the forgery was not given within a year, as provided in section 326 of the Negotiable Instruments Law. The appellants concede this defense to be valid. As a defense to the remaining forged checks the bank pleaded that the depositor was guilty of negligence in examining the statements of account rendered by the bank, which negligence contributed to the payment of these forged checks. The depositor then raised the contention that the bank was itself negligent in paying these checks, which negligence defeated such a defense. The trial court directed a verdict for the defendant upon the stipulation by both parties to move for a directed verdict, thus finding the depositor negligent and the bank free from negligence.

The only issues, therefore, to be decided upon this appeal are: (1) Was the trial court correct in finding the depositor negligent in examining the statements of account rendered by the bank? (2) Was the trial court correct in finding the bank free from negligence in paying the forged checks?

The copartnership of August Stumpp & Company was a depositor in the defendant bank, and had been such for some years prior to May 1, 1916. It had in its employ as a bookkeeper one Herbert Pratt, who had charge of the copartnership's check book and made the entries on the stubs thereof. On January 6, 1909, the appellants designated Pratt as the person to receive and receipt for the statements and canceled vouchers of their account with respondent, such designation being in writing and bearing on its face a specimen signature of Pratt. Thereafter Pratt received the appellants' vouchers from respondent.

Pratt conceived a plan for defrauding his employers, which was possible of execution because of his knowledge of the way in which they checked up their statements and vouchers returned through

39

him by the bank. This consisted in falsifying the additions of the deposits in the bank by making them as much less than they really were as would represent the total of the forged checks drawn during the period by him. Thus, though the balance shown on the check book would correspond with the balance returned by the bank, the result would be reached by Pratt by reducing the deposits as entered by him on the check book by so much as he had withdrawn on forged checks which, of course, he did not enter on the stub side of the check book. Knowing how slight was the risk he ran because of the appellants' lack of examination of the returned vouchers and their failure to compare the same or the statements with their books in detail, he guarded against accidental detection by drawing the forged checks either in even hundreds or in such a way that two forged checks together made an even thousand, thus reducing the chances of detection of the erroneous additions. The first forged check was one for $400, dated May 22, 1916. In the record are shown the stubs of the checks drawn from May twentieth to May twenty-third. There is no $400 check shown thereon. The record also shows the opposite page of the check book, whereon were entered the deposits from May twentieth to May twenty-second, inclusive, and the addition made in Pratt's handwriting, including the previous balance, shows a total of $11,364 of deposits. In point of fact, the deposits there shown add up $11,764. It was by this falsification that Pratt concealed the cashing of the forged $400 check. He also covered up his forgeries by increasing the totals of checks drawn as under date of May 23, 1917, when four checks aggregating $3,476.51 were entered as totaling $4,076.51, thus covering a $600 forgery not entered. Pratt under his authority from the plaintiffs obtained the vouchers from the Bank of New York monthly, and on each occasion abstracted from the bundle of vouchers, before turning it over to plaintiffs, the forged checks which had been paid to him in cash over the counter of the bank during the preceding month.

The Bank of New York adopted many years ago a system by which the bank book of the depositor was not balanced, but an itemized statement of checks and credits was made out at the end of each month and sent to the depositor with the vouchers. A copy of the statement for May, 1916, appears in the record. The tabulation of the checks is made in double columns. Where there were checks cashed on a given day, they were in many instances, though not always, entered in the first column of amounts, and then the total of such checks carried into the second column of amounts. The forged check for $400 of May 22, 1916, was cashed on that date and appears under that date in the bank's statement.

When Pratt in this instance brought the voucher checks back from the bank along with the statement, he abstracted the $400 check from the eighty-nine canceled checks the bank had handed to him, and after doing so gave the bundle and statement to Mr. August Stumpp, the senior partner of the plaintiff firm. Mr. Stumpp then took the check book and compared the vouchers so handed him with the stubs. These tallied exactly with the entries on the check book of checks drawn, leaving some few checks still outstanding. Stumpp then added the amount of the outstanding checks to the balance shown on the check book, and found that the sum thus reached checked exactly with the balance shown by the bank. Finding that the two corresponded exactly, he made no further examination.

The method of checking the bank balance and the returned vouchers with the check book, followed in June, 1916, was followed by Mr. Stumpp in each succeeding month.

The testimony of Mr. August Stumpp on this point is as follows: "Q. What was your system that you used when vouchers came back from the Bank of New York of checking up your account with the bank vouchers? A. I checked every voucher with my check book, and then I compared the balance of the Bank of New York with our balance, and of course some checks may not have been paid which we already had written out, so I added these unpaid checks to their balance, and then made it agree, that is tried to make it agree, and when I found it agreed, I said it is all right."

And again, under cross-examination he testified: "Q. Now did you take any pains, or did you, in fact, ever add up the totals of the checks on any page of stubs? A. I did not except now and then I probably did, but at the time when I received those vouchers I only compared them with my check book, but I did not make the additions. Q. You did not verify the additions at the foot of the check book? A. I did not. * * * Q. These monthly statements attached to the stipulation were quite similar, were they not, in general form to those that you had been in the habit of receiving for years? A. Well, I do not know for how many years, it may be only three or four years. It is a novel way, and I did not understand the purpose of it, I received them, looked at the balance, and then I had my vouchers and I compared my vouchers, and then of course I made the balance, whether it agreed with your final statement."

And again: "Q. Now did you compare the items on these statements under the heading 'Credits' with the items shown in the check book? The Court: May I call your attention to the fact

First Department, May, 1925.          [Vol. 212

that this gentleman has already told me he did not compare anything with that statement; he did not examine the statement at all, directly or indirectly, on the credit or debit side. That is true, isn't it? The Witness: That is true; I considered —. The Court: Wait a minute. That is enough."

In response to questions by the court, he again epitomized what he did towards checking up the statement from the bank as follows: " The Court: May I ask a question before you do that? When your check came back from the bank, I understood you to say you checked over the vouchers? The Witness: I did. The Court: Wait a minute. Let me finish. You checked over the vouchers against the stubs in your check book, is that right? The Witness: Yes. The Court: And then you found that the statement of balance of the bank agreed with your balance? The Witness: Of course there was a difference and I added these checks. The Court: I mean with the allowance for the outstanding checks, they always agreed? The Witness: Yes, they agreed, yes. The Court: Was there one of those typewritten lists of vouchers paid, with the vouchers? The Witness: There was a — I did not understand. Mr. Bacon: These are copies of the statements rendered by the bank. The Court: I do not mean those. When you got your vouchers back from the bank, did they not have with them a list made up on the adding machine of the amounts of each individual voucher totalled at the end? The Witness: They had in 1917, yes. The Court: Did they in 1916? The Witness: I do not know, they might have had. The Court: What I want to ask you is this: You understand what I mean? The Witness: Oh, yes, I fully understand you. The Court: Did you check against that list? The Witness: I did not, I have now. At that time for about thirty years I always compared my vouchers. The Court: I only want to know what you did then. The Witness: No, I did not. Q. You simply took the vouchers that Pratt handed you, is that right? A. Yes, sir."

The vouchers were returned by the bank in an envelope in the following general form:

[Envelope]

" August Stumpp & Co.
     " 66 Beaver St.
          " New York, N. Y.
" From Aug. 1, 1917 to Sep. 1, 1917.

" Returning 70 cancelled vouchers with statement enclosed showing a balance to your credit of $4,237.95. Please examine at once and sign and return to the Bank of New York, N. B. A., the enclosed receipt."

The envelope was accompanied by a card in the following form, to be filled in by the depositor and returned to the bank:

" To be signed by the Depositor and returned to the Bank

" NEW YORK, *June* 18, 1917

" Received from the Bank of New York, N. B. A. statement of account to May 1, 1917, with 137 vouchers, showing a balance of $20,982.31 which agrees with our books.

" (Signed)   AUGUST STUMPP & CO.

" (Depositor's Signature)

" Kindly notify us of any change of address." .

In some of the cards in evidence the number of vouchers acknowledged is left blank, in others it varies from the bank's statement.

The forgeries committed by Pratt were as follows: May 22, 1916, $400; September 5, 1916, $500; December 13, 1916, $500; December 29, 1916, $500; February 5, 1917, $500; February 7, 1917, $500; May 2, 1917, $400; May 24, 1917, $600; June 8, 1917, $500; June 18, 1917, $500; June 25, 1917, $500; July 9, 1917, $500;  July 16, 1917, $550; July 23, 1917, $450; August 8, 1917, $545; August 13, 1917, $455; August 16, 1917, $550; August 21, 1917, $650; August 25, 1917, $653.44; August 30, 1917, $475; August 31, 1917, $525.

The only odd amount appearing on this list ($3.44) was covered by Pratt making a deposit ending with those figures on August twenty-second which he did not enter in the check book.

The forgeries committed by Pratt were not discovered ·by plaintiffs, because of their manner of checking up their bank statements, until Pratt forged a check for $5,000 on plaintiffs' reserve account in the Farmers' Loan and Trust Company, deposited it secretly to the credit of plaintiffs in their account with the defendant bank and drew out the proceeds by a series of forged checks, then absconding, taking advantage of the intervening Sunday and Labor Day of 1917 to make his successful escape.   On September 11, 1917, the plaintiffs notified defendant of his flight and of the disappearance of eight vouchers for the months of August, which were apparently forgeries.   Full investigation thereafter revealed the extent of Pratt's crimes as above enumerated.   It is quite apparent that Pratt's immunity from discovery for so long a period of time was due to plaintiffs' way of conducting their so-called examination of the returned statements and vouchers from the bank.   They did not even add up the columns of figures of deposits and withdrawals by check, as entered by Pratt in their books. All they did was (1) to check the returned vouchers against the stubs in their check book, and (2) to see if the balance appearing in their check book corresponded with the balance shown in the bank's statement.   I am of the opinion that this was insufficient

to constitute ordinary care, and that their failure to do more constituted negligence on their part. Under the authorities, I believe that the depositor, upon the return of his vouchers from the bank accompanied by a statement of the transactions in his account for the preceding month, is bound to do three things: (1) Compare the vouchers returned by the bank with the check stubs in his stub book; (2) compare the balance entered in the statement (or pass book) with the balance in his stub book; (3) compare the returned vouchers with the list of checks entered in the statement (or check list). If such examination is made with ordinary care and no error is detected, then the depositor is not negligent; if he fails to make any or all of these comparisons, and such comparison would have disclosed the forgery, then he is negligent and cannot recover from the bank.

In *Morgan* v. *U. S. Mortgage & Trust Co.* (208 N. Y. 218) Judge HISCOCK said: " The important question presented on this appeal concerns the obligation of a depositor in a bank to examine his pass book and returned vouchers as a protection against the payment by the bank of forged checks.

" The action was brought to recover a large amount paid by the respondent on a series of forged checks drawn in the name of appellants and charged to their account. The forgeries were conceded but the respondent defended against the repayment of the amounts by it paid out on said checks, with the exception of four subject to special consideration, on the ground that appellants had contributed to such payment by their negligence in not examining their pass book and vouchers, and that it had not been guilty of any negligence in paying the checks. The court ruled with the respondent on this defense as matter of law and refused to submit either proposition thus stated to the jury.

" The important facts which gave rise to the controversy are as follows:

" Prior to May 18, 1904, the appellants had opened and maintained with the respondent a deposit account with considerable credit balances. Checks drawn on this account were signed by means of a rubber stamp imprinting the words ' Estate of David P. Morgan,' and authenticated by the actual signature of either trustee. The appellants had in their employ a trusted clerk who was their immediate agent in dealing with the bank. He made deposits, filled out the body of checks and obtained from the bank the pass book and vouchers and check list whenever the account was balanced. Between May 18, 1904, and May 20, 1905, he forged twenty-eight checks aggregating a large sum and employing in his forgeries the simulated signature of the trustee Morgan.

" These checks were paid by the bank and together with the genuine ones drawn during the same period were charged to the appellants on the books of the bank. Five times during the period the former's pass book was written up and balanced and on each occasion the checks paid by the bank since the last balancing, together with an itemized statement or list thereof and the pass book were returned to appellants by delivery to their agent Hennessey. The latter withdrew from the bundle of vouchers and destroyed the checks forged by him and also the check list and then, after delaying as long as convenient, delivered the pass book and the genuine vouchers to Kissell who understood that the rules of respondent required that the pass book should be balanced every month or two months and that, after balancing, it was returned with the paid checks as vouchers, and with a detailed list thereof.

" The estate through Hennessey as its bookkeeper kept a journal and ledger containing ·an account with ·the bank and from which there were drawn off once or twice during the period in question trial balances. It also had a regular check book upon the stubs of which were entered the genuine checks presented to and paid by the bank. Kissell, who seems to have been the more active trustee, never asked for the check list which he knew was returned by the bank when the pass book was balanced up and never examined the balances shown by the pass book and which were struck after payment of the forged checks. He contented himself during the period in question with comparing the genuine vouchers permitted by Hennessey to come into his hands with the check book and with the other books of the estate, and which comparison of course disclosed no signs of Hennessey's forgeries. The other trustee in whatever examinations he made never examined the pass book or the check list. * * *.

" There then remains the single question already outlined and which will be discussed, whether the appellants were guilty of negligence after the lapse of a reasonable time in not examining their pass book and list of vouchers and ascertaining what they were being charged with and thus discovering the existence of the forged checks. It will be remembered that on five occasions when their account was written up all they did was to compare the genuine vouchers which their dishonest clerk permitted to reach their hands with their check book and ledger and that they did not ask for the check list which itemized all paid checks, both genuine and forged, or examine the pass book which showed balances after deducting forged checks.

" It is well established that appellants owed the duty of making some examination and verification of their account with the bank

when the pass book and vouchers were returned.   This is conceded by them, but they insist that this duty was fully discharged by comparing with the ·check book the genuine vouchers which Hennessey allowed to reach them.   The record before us, however, discloses how incomplete and ineffective this examination was even as against the primitive methods which Hennessey employed to prevent detection of his wrongdoing by suppression and destruction of the forged vouchers and check list.   On the other hand, if they had examined the check list and pass book, and if necessary compared. them with their own books, they would have discovered at once the payment and debit to their account of checks which they had not drawn and the forgeries would have been uncovered. There is no question about that of course.   The only question is whether a jury would have been permitted to say that they were free from negligence when they closed their eyes or turned them away from these certain means of detection of their own agent's wrongdoing which were furnished to them for that very purpose by the bank.   I do not think it would have been permitted to so determine.   Negligence in this case means the neglect to do those things dictated by ordinary business customs and prudence and fair dealing toward the bank, which if done would have prevented the wrongdoing which resulted from their omission.   We may take notice of the custom practically universal amongst banks at frequent intervals to write up and balance the pass books of their customers and return them with paid checks or other instruments as vouchers for the payments made and charged to the depositor. The appellants were business men and fully understood this.   They apparently knew the rule of the bank requiring accounts to be written up every month or two, and they knew that there were returned with the pass book not only the vouchers but an itemized list thereof as debited to the account.   When they submitted their pass book to be thus written up they in effect called for a statement of their account as kept by the bank, and when this was furnished to them is it to be thought that they satisfied the requirements of common prudence and fairness to the bank by absolutely disregarding the pass book and check list which could not be easily falsified and simply comparing a bundle of vouchers which might be much more easily manipulated by ready abstraction of vouchers?   The pass book is the statement of the bank's version of the account and the fundamental basis for comparison with the depositor's own records.   The paid checks which are returned are the vouchers of the bank for its account as written on the pass book, and if they are to be made the medium of comparison of accounts the depositor at least ought to endeavor to know that they tally with the pass

book. Otherwise he has made no reliable comparison or verification. Therefore, it seems to me, that when the appellants relied for verification merely on a comparison of vouchers without any effort to verify these by comparison with the check list or pass book they did not exercise reasonable methods. On the other hand, it seems to me, that when, having obtained from the bank a list of vouchers and balanced pass book which were intended to give and did give them a correct basis for comparison and verification, they disregarded these, they were guilty of such obvious oblivion of their duties that no extended argument can make plainer their negligence than does the mere recital of the facts.

" The authorities which have been called to our attention do not establish anything in opposition to these views, but the later ones tend to sustain them."

That case is squarely in point as holding that it was the depositor's duty to compare the returned vouchers not merely with their own books, but with the check list of vouchers returned to them by the bank as well.

Appellants rely upon the cases of *Weisser's Administrators* v. *Denison* (10 N. Y. 68) and *Frank* v. *Chemical National Bank* (84 id. 209). Both these cases were discussed in the *Morgan* case. Judge HISCOCK limited the decision in the former case to what was actually before the court for determination. As to the *Frank* case he called attention to the fact that in that case the plaintiffs had not only compared the checks returned to them with the stubs in the check book, and the balance in the pass book with the balance appearing in the check book (which always corresponded), but they also compared the returned checks with the entries in the pass book by having the dishonest clerk who had committed the forgeries read the entries while he had the checks, and no discrepancy appearing, the account was deemed to be correct and was not further examined. It there appeared that the clerk by abstraction of forged vouchers and by false balances and readings deceived plaintiffs and prevented them from ascertaining by means of the examination thus conducted the true state of the account and the fact of the forgeries. But, as Judge HISCOCK remarked (at p. 226), the plaintiffs in that case did precisely what the plaintiffs in the *Morgan* case and in the present case failed to do — compare their pass book (now statement and vouchers) with their own book. And (at p. 228) the rule was recognized that " the depositor who sends his pass book to be written up and receives it back with his paid checks as vouchers, is bound to examine the pass book and vouchers and to report to the bank without unreasonable delay any errors which may be discovered." And this rule is equally applicable under

existing business procedure, under which the bank returns the statement of account and paid vouchers monthly, without waiting to be requested to balance the pass book, and where the duty of the depositor is to make examination of such statement and vouchers and report within a reasonable time any errors that he may deem to exist therein.

The case of *Stumpp* v. *Farmers' Loan & Trust Co.* (109 Misc. 24; 197 App. Div. 949; 198 id. 997) is not *res adjudicata* as to the present action; and whatever *dicta* there are in that case as to plaintiffs' freedom from negligence are not borne out by the evidence in the present case, and are not binding as to this defendant, who was not a party to that action.

The record discloses no evidence upon which a finding could be based that defendant was guilty of any negligence, and as upon the facts the plaintiffs must be held to have been guilty of negligence for the reasons hereinbefore assigned, it follows that the judgment herein was correct and should be affirmed, with costs to respondent.

CLARKE, P. J., FINCH, McAVOY and MARTIN, JJ., concur.

Judgment affirmed, with costs.