THE COMMERCE-GUARDIAN BANK, APPELLANT, *v.* THE TOLEDO TRUST CO., APPELLEE.

(Decided July 5, 1938.)

*Messrs. Boggs, Chase & Smith* and *Mr. P. R. Taylor,* for appellant.

*Messrs. Smith, Beckwith, Ohlinger & Froehlich,* for appellee.

OVERMYER, J.   The plaintiff, The Commerce-Guardian Bank, brought an action in Common Pleas Court to recover from The Toledo Trust Company the sum of $14,750 paid by plaintiff to one of its customers to make good three forged checks totaling that sum, drawn on plaintiff bank and deposited by the forger-

payee in the defendant bank. A demurrer was sustained to the second amended and supplemental petition of the plaintiff and judgment entered for costs. This appeal is prosecuted to reverse that judgment.

The alleged facts set up in the petition upon which plaintiff predicated its right to recover, which for the present consideration we assume to be true, are as follows:

Both of said banks, parties hereto, are located in Toledo, Ohio, within a few blocks of each other, and plaintiff will be referred to herein as "Commerce Guardian" and defendant as "Toledo Trust."

On or about March 26, 1935, a man introducing himself as Franklin L. Liberman presented himself at the windows of the offices of Toledo Trust at Superior street and Madison avenue, and stated he wished to open an account and deposit the sum of $300 in cash therein. Liberman was a stranger and unknown to the officers and employees at the bank. Inquiry was made of the stranger as to his former bank connections, his present bank accounts and references. He stated that he had no former bank accounts or present bank accounts, and gave no local references other than a customer of the bank who had sent him there. He stated that his business was buying waste materials, rags, etc., gave an office address in Toledo and a residence address in an apartment hotel in Toledo, and stated he had recently arrived from Cleveland, Ohio.

His account was thereupon accepted, he signed the customary signature card for the bank in triplicate, leaving blank certain spaces for further information, and the sum of $300 in money was deposited by him in the account in the name aforesaid. The name given by the depositor as his own was false and fictitious.

On April 3, 1935, said depositor, whose assumed name will be used herein, presented at said branch Toledo Trust bank for deposit a check in the sum of

$3,375, drawn to his order, indorsed by him with the assumed name of Franklin L. Liberman, purporting to have been signed by a depositor in the Commerce Guardian, namely, the president of Commerce Guardian. The Toledo Trust accepted the check for deposit, not then paying any consideration therefor, and the next day indorsed the same for payment to any bank or through the Toledo Clearing House, guaranteeing prior endorsements, and the check was presented by Toledo Trust to Commerce Guardian for payment through the Toledo Clearing House. Said check was not the check of the president of Commerce Guardian by whom it was purportedly signed, but was a forgery.

The check was honored and paid by the Commerce Guardian, drawee, and the sum represented by it was deposited to Liberman's account at Toledo Trust. On April 6, 1935, Liberman withdrew the sum of $2,475 in cash from his account at Toledo Trust, on his check. On April 8, 1935, he withdrew $675 in cash, on his check. The Commerce Guardian was later compelled to and did make good to its depositor (its president) said sum of $3,375 so paid by it to Toledo Trust on such forged check.

The aforesaid transaction is set forth in a first cause of action in the second amended and supplemental petition of plaintiff Commerce Guardian. Following this cause of action, and with all allegations and averments of a preliminary statement in the petition hereafter referred to, fully adopted and reaffirmed, there appear the second and third causes of action of like tenor and similar allegations, covering a check for $4,530, presented to Toledo Trust on April 8, 1935, in the second cause of action, and a check for $6,845 presented to Toledo Trust on April 12, 1935, in the third cause of action. All three checks bore the same forged name of drawer, namely, the president of Commerce Guardian, were drawn on Commerce Guardian and

honored and paid by it when presented through the Toledo Clearing House. The total of such checks represents a sum of $14,750, which sum has been reduced to $11,349.50 by a credit which is hereinafter referred to and is the amount Commerce Guardian seeks to recover from Toledo Trust in this action, it having made good to its depositor the sums represented by said checks.

Other withdrawals had been made by Liberman from his account at Toledo Trust until the discovery of the forgeries by the Commerce Guardian depositor (its president) on April 15, 1935. Upon discovery of the forgeries, Commerce Guardian at once notified Toledo Trust and directed the arrest of Liberman if he should appear. He did appear at Toledo Trust within a short time after Toledo Trust was so notified and presented another like check for $2,700, but it was not accepted. Liberman was told that the officers of Toledo Trust wished to see him, and in a few minutes Liberman was ''gone with the wind'' and to date has not been apprehended.

Remaining in his account at Toledo Trust was the sum of $3,400.50, which sum Toledo Trust has, during the pendency of this action, turned over to Commerce Guardian, and is the credit to which reference is made above.

In the preliminary statement set out in the first part of the second amended and supplemental petition hereinbefore referred to, and under each cause of action, are set forth the claims upon which Commerce Guardian seeks to ground its right to recover by charging Toledo Trust, its officers, bookkeepers and employees with negligence and failure to follow approved banking practices in the acceptance and opening of said account by Liberman; in permitting the presentation to it and acceptance of the forged checks; and in the withdrawals from the account by Liberman of

the various sums indicated from time to time during the period of twelve days from April 3 to April 15.

It is alleged that at the times referred to there was a general custom and practice among the banks of Toledo requiring more complete information from a prospective customer who is a stranger to the bank than was required by Toledo Trust of Liberman; that a custom existed to watch any new account of a stranger for a period of at least thirty days, and to report to the officers of the bank any unusual or suspicious circumstances connected therewith, and to place a mark, called a "flag," on such customer's signature card, warning all employees of the bank that such account was to be carefully watched. It is charged that these customs were known to Toledo Trust but were not observed or followed in this instance, and that if the bank had followed such customs and made proper investigation, it would or should have been put upon its guard and prevented said losses.

It is further charged that at that time Toledo Trust had a rule, applying to all but well-known depositors, preventing the withdrawal of currency in excess of three or four hundred dollars by a check unless the check bore an approval by initial or otherwise of an officer of the bank, and that this rule was not observed or enforced in this instance.

It is further alleged that the Commerce Guardian relied upon the aforesaid customs and rules being observed by Toledo Trust, and that thereby, and by the endorsement of Toledo Trust guaranteeing all prior endorsements, it, the Commerce Guardian, was deceived and induced to rely thereon that the check was genuine and in all respects what it purported to be. It is also alleged that the president of Commerce Guardian, whose name was forged to the checks as drawer, had for a number of years been engaged in Toledo in the iron and steel business, exclusively, as

a representative of eastern steel mills in sales of their products in large quantities and at wholesale.

The issue raised by the demurrer to the foregoing facts has been discussed by counsel in elaborate and helpful briefs, which we have examined, together with many leading authorities cited therein and other authorities found on independent investigation. Within the limitations of this opinion we can not discuss and compare all of them. We shall state our conclusions and the authorities we think support them.

The plaintiff, Commerce Guardian, bases its claim of a right to recover largely on the early case of *Ellis & Morton* v. *Ohio Life Ins. & Trust Co.*, 4 Ohio St., 628, wherein it is claimed to have been decided, and since generally followed, that money thus paid upon a mistake of facts, as a rule, may be recovered back, but not when the payment has been made by the drawee of a forged check to a holder for value and without fault, but that such exception does not apply when, in compliance with a custom, local or general, the holder assumes the duty of exercising some material precaution to prevent the fraud and then fails to perform such duty and thereby induces the drawee bank to relax its own vigilance and pay the check.

After a full discussion of the above case and other leading authorities on the subject, the brief of plaintiff then states:

"In the majority of cases, and especially lately, the tendency has been to permit the drawee bank to recover, not on the ground of negligence in carrying out a local custom but on the much broader ground of negligence in failing to make inquiry."

We think this a fair statement of the law relating to the cashing of a check for a stranger when presented to a bank other than the drawee. Just what facts and circumstances will constitute negligence in "failing to make inquiry" is not so simple a matter; that is, just

how much of an inquiry or investigation must the presenting bank make to relieve itself of the charge of negligence, especially when the check is presented by a payee who has previously opened an account at such bank and has identified himself at that time sufficiently to meet that bank's requirements for that purpose? In the discussions, the authorities use the expressions "without inquiry," "due inquiry," "some precautions," "proper precautions," "making inquiry," etc.

We think the general rule is authoritatively stated in 9 Corpus Juris Secundum, 759, Section 357, *b* (1):

"In the absence of a statute to the contrary, under the generally accepted rule of *Price* v. *Neal,* 3 Burr., 1355, a drawee bank cannot recover its payment on a check or draft, wherein the signature of the drawer has been forged, from a bona fide holder for value. This rule, however, does not prohibit the bank from recovering from forgers, thieves or those who have no title to the instrument, or from a holder who by his negligence or fault has proximately contributed to the success of the fraud, or has misled the bank, or from one who is not a holder for value or who will be in no way prejudiced by being compelled to make repayment to the bank. The action by the drawee against the holder, in such case, is in the nature of an action for money had and received under a mistake, and the fundamental basis of recovery is in the act of bad faith or negligence of the holder as the primary cause of the loss."

And at pages 768, 769, Section 358, *a* (1):

"The customary practice of banks is to require identification of strangers, and for that reason the drawee bank has a right to assume that the bank receiving the check has in accordance with such practice, made inquiry and required identification, and, hence, the negligence of such bank in this respect renders it liable to the drawee bank if the name of the drawer has been forged, unless the drawee bank has

itself been negligent. * * * Likewise, recovery may not be had against a holder bank merely because it has endorsed a forged check 'previous indorsements guaranteed.' '' Such guaranty of prior indorsements is not a voucher for the genuineness of the signature of the maker of the check, and a drawee bank which pays a forged check cannot become a holder in due course. 9 Corpus Juris Secundum, 769, Section 358, *a* (2), and cases cited.

Supporting the above text there are collected and discussed in the notes the leading authorities on the question, and the same general rules are given in 7 American Jurisprudence, 417, 419, ''Banks,'' and 5 Ruling Case Law, 556 *et seq*. Adopting these authoritative and up to date statements of the law obviates the necessity of a comparison and discussion of the host of cases cited and discussed in the respective briefs of the parties.

At the very outset it must be stated that certain important facts shown in the instant case are not all to be found in any of the cases cited in support of general rules governing the relations and liabilities of banks handling forged checks. We do not mean to say that these facts have the effect of changing general rules, but they do have the effect of turning the scales in the determination of the question as to what rule to apply. The facts referred to are that the presenting bank and the drawee bank are in the same city, within a few blocks of each other; that the forgeries were of the name of the president of the drawee bank, and there is no claim made that he was out of the city, or ill, or absent from his bank during the period; that the presenting bank did make some inquiry of the applying customer before his account was opened and deposit accepted; that no money was paid to the forger by the presenting bank until the check was honored and paid by the drawee bank; that after the first

forged check was honored and paid by drawee, two more checks of the same kind were presented to the presenting bank and no withdrawals permitted thereon or attempted until they had been honored and paid by the drawee bank; the presenting bank does not have or retain any of the money paid to it on the three forged checks, the forger thereof having received most of it and the drawee bank the balance, and Toledo Trust was not enriched by the transaction; the first appearance of the forger at Toledo Trust was not to cash a check, as was the case in *Ellis & Morton* v. *Ohio Life Ins. & Trust Co., supra,* relied on by plaintiff, but to open an account, with a cash deposit. In the *Ellis & Morton case* no questions were asked when the check was presented by the forger.

Can the payment of these forged checks by Commerce Guardian, bearing the forged name of the president of the drawee bank, be denominated in law a payment "by mistake," and, if so, what acts of the holder induced the drawee bank to make the mistake?

We think, and our view is supported by the authorities, that a clear distinction is to be made between those cases where the presenting or first bank immediately cashes the forged check before presenting it to the drawee, and those cases, as in the instant case, where the first bank pays out the money only after the check is honored by the drawee. It is the paying out of the money that creates the loss, and until the money is paid to the forger no one has lost it. Herein, we think, we must look for the proximate cause of the loss. See Brady, "Bank Checks" (2 Ed.), 239, Section 156.

A bank is presumed to know the signature of its depositors. It is certainly presumed to know the signature of a depositor who is also the president of the bank. The petition alleges that the forgeries were so cleverly executed that the drawee bank was fooled or

deceived. That fact cannot be laid at the door of the presenting bank. On the contrary, if the forgery was so apparently perfect, there would be reason for the presenting bank assuming it to be genuine, especially the signature of a prominent businessman involved in many enterprises of large proportions, as the petition states was the fact. The presenting bank did not deposit the proceeds of the check to the forger's account until the drawee bank had honored and paid it, which in its effect was the same as if the check had been merely accepted "for collection," though we are aware these checks do not come strictly within that class. This was not a deception or inducement to the drawee bank to make a mistake. The presenting bank guaranteed prior endorsements but not the signature of the maker. The opening of an account by a new customer was a concern of the bank where the account was being opened, and the opening of that account by Liberman in the Toledo Trust could not be the proximate cause of the Commerce Guardian's failure to detect the forgery of its president's signature on a check, nor could the opening of that account, nor Toledo Trust's endorsement on the checks, be held to have induced Commerce Guardian to relax its vigilance in watching its depositor's checks. *First National Bank of Belmont* v. *First National Bank of Barnesville,* 58 Ohio St., 207, 50 N. E., 723, 65 Am. St. Rep., 748, 41 L. R. A., 584; 29 Ohio Jurisprudence, 1060, Section 305.

Upon consideration of the foregoing facts, the authorities cited, and the two leading cases in Ohio, viz., the *Ellis & Morton case, supra,* and the *Bank of Belmont case, supra,* we find and hold that the second amended and supplemental petition of plaintiff does not state a cause of action. Except for the matter of local custom found in the *Ellis & Morton case,* that case can be of small comfort to plaintiff, and as heretofore pointed out, the plaintiff itself says in its brief

that in the later cases generally, where recovery is allowed, it is not based so much upon custom as on the broader theory of negligence in failing to make inquiry, and under the authorities such failure to make inquiry must have induced or caused the drawee bank to be thrown off its guard or misled or to have relaxed its vigilance. We can not see how the facts alleged here make out a case under the rule.

A charge of negligence implies the breach of some duty. There is no allegation that Toledo Trust owed a specific duty to Commerce Guardian and failed to perform it. The recovery of money paid under mistake is allowed on the theory that one may not unjustly enrich himself at the expense of another. Here the Toledo Trust admittedly has none of the money paid to it by Commerce Guardian on these checks. What may have transpired after the forgeries were discovered could in no respect be considered as an inducement to Commerce Guardian to have honored and paid the checks.

The Uniform Negotiable Instrument Law, adopted in Ohio in 1902, provides in Section 62 (Section 8167, General Code) as follows:

"By accepting the instrument the acceptor engages that he will pay it according to the tenor of his acceptance and admits:

"1. The existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument.

"2. The existence of the payee and his then capacity to endorse."

It is claimed by Toledo Trust that payment of the checks by Commerce Guardian included acceptance, and authorities are cited to support the claim. We shall quote from one of these authorities where the logic of the opinion, we think, is sound. In *Fidelity & Casualty Co.* v. *Planenscheck*, 200 Wis., 304, 227 N. W.,

387, the court said, discussing the foregoing section of the Uniform Negotiable Instruments Law:

"While the statute says nothing about the effect of payment of the instrument, this is because payment plainly constitutes an acceptance, as to which all courts are in agreement. So far as these two sections have been construed, with a single exception, it has been held that they adopt the principle of *Price* v. *Neal*, 3 Burr., 1354, in its purity, free from the exceptions which many American courts grafted onto the rule."

It is further claimed by Toledo Trust, we think with merit, that under authority of *Belmont Bank case, supra, National Bank of Rolla* v. *First National Bank,* 141 Mo. App., 719, 125 S. W., 513, *Security Com. & Savings Bank* v. *Southern Trust,* 74 Cal. App., 734, 241 P., 945, and other authorities, the endorsements placed upon these checks by Toledo Trust had the effect of being notice to Commerce Guardian that Toledo Trust was not the owner and holder of the checks, but was simply collecting these checks for its depositor.

Discussion might be extended to scores of cases on the subject, but no useful purpose would be served thereby.

We hold that the trial court was not in error in sustaining the demurrer to the petition and the judgment will be affirmed.

*Judgment affirmed.*

LLOYD and CARPENTER, JJ., concur.