Fidelity & Casualty Company, Appellant, vs. Planen-
scheck, Respondent.

*October 10, 1929—January 7, 1930.*

306

For the appellant there were briefs by *McGovern, Curtis, Devos & Reiss* of Milwaukee, and oral argument by *H. K. Curtis* and *F. E. McGovern.*

For the respondent there was a brief by *Bassuener & Humke* and *Arthur H. Gruhle,* and oral argument by *John M. Poole,* all of Sheboygan.

The following opinion was filed November 5, 1929:

OWEN, J.   It was early held that the drawee of a bill of exchange could not recover the amount paid out by him on a bill to which the name of the drawer had been forged, in an action for money had and received.  *Price v. Neal,* 3 Burr. 1355.  It was said that the drawee was bound to know the handwriting of the drawer, that his negligence in paying out money on the forged signature of the drawer was greater than the negligence of any one else connected with the bill, and that "where the loss has fallen there it must lie.  One innocent man must not relieve himself by throwing it on another."   In further elucidation of this doctrine, we may quote the language of MATHEW, J., in *London & R. P. Bank v. Bank of Liverpool,* L. R. 1 Q. B. Div. [1896] 7, where he said:

"In *Cocks v. Masterman,* 9 B. & C. 902, the simple rule was laid down in clear language for the first time that when a bill becomes due and is presented for payment the holder ought to know at once whether the bill is going to be paid or not.  If the mistake is discovered at once, it may be the money can be recovered back; but if it be not, and the money is paid in good faith and is received in good faith, and there is an interval of time in which the position of the holder may be altered, the principle seems to apply that money once paid cannot be recovered back.  That rule is obviously, as it seems to me, indispensable for the conduct of business.  A holder of a bill cannot possibly fail to have his position affected if there be any interval of time during which he holds the money as his own, or spends it

as his own, and if he is subsequently sought to be made responsible to hand it back."

This rule has met with varying favor in this country. It has been assailed by text-writers, repudiated by some courts, and adopted with exceptions by others. Although this court has not contributed to the controversy, there has been much discussion and disagreement concerning the question, as will amply appear from a consideration of 4 Harvard Law Review, 297; 24 Michigan Law Review, 809; *Bank of Williamson v. McDowell County Bank,* 66 W. Va. 545, 66 S. E. 761; *First Nat. Bank v. U. S. Nat. Bank,* 100 Oreg. 264, 197 Pac. 547, 14 A. L. R. 479, and note in 12 A. L. R. p. 1089.

The framers of the Negotiable Instruments Act resolved this controversy and gave expression to what they presumably considered the sound and just rule in two sections of the act, which will be found in our statutes as secs. 116.67 and 118.64. The former provides that "The acceptor by accepting the instrument engages that he will pay it according to the tenor of his acceptance; and admits (1) the existence of the drawer, the genuineness of his signature, and his capacity and authority to draw the instrument; and (2) the existence of the payee and his then capacity to indorse." The latter provides that "Where the holder of a check procures it to be accepted or certified the drawer and all indorsers are discharged from liability thereon." While the statute says nothing about the effect of payment of the instrument, this is because payment plainly constitutes an acceptance, as to which all courts are in agreement. So far as these two sections have been construed, with a single exception, it has been held that they adopt the principle of *Price v. Neal* in its purity, free from the exceptions which many Amercian courts grafted onto the rule. *Title G. & T. Co. v. Haven,* 196 N. Y. 487, 89 N. E. 1082; *National Bank of Rolla v. First Nat. Bank,* 141 Mo. App. 719, 125

S. W. 513; *National Bank of Commerce v. Mechanics' Am. Nat. Bank,* 148 Mo. App. 1, 127 S. W. 429; *First Nat. Bank v. Bank of Cottage Grove,* 59 Oreg. 388, 117 Pac. 293; *State Nat. Bank v. Bank of Magdalena,* 21 N. M. 653, 157 Pac. 498, L. R. A. 1916 E, 1296; *Figuers v. Fly,* 137 Tenn. 358, 193 S. W. 117.

*First Nat. Bank v. U. S. Nat. Bank,* 100 Oreg. 264, 197 Pac. 547, 14 A. L. R. 479, seems to hold that these provisions of the Uniform Negotiable Instruments Act preserved the exceptions to the rule of *Price v. Neal,* approved and adopted by the majority of American courts. We have considered the reasons assigned by the Oregon court for its conclusion, and do not regard them of sufficient force to justify us in dissenting from what appears to be an otherwise uniform construction of this statute.

The adoption of the Negotiable Instruments Act by nearly every state of the Union resulted from a belief that a uniform law upon the subject approximated in importance a national currency system, and it was passed for the purpose of harmonizing and making uniform the law upon a subject concerning which there was much disagreement, giving rise to embarrassment and confusion in the commercial world. The end thus attained should not be frittered away by conflicting judicial interpretations of that act. In construing the act courts should the more readily yield to precedent in order to avoid a conflict of authority as discouraging as the situation existing prior to the adoption of the law.

While a discussion of the merits of the rule as embodied in the statute is now quite beside the mark, we are prompted to say that it is a rule of definiteness and certainty, and promotes the integrity of negotiable instruments, which have come into use as a sort of secondary currency system in our business transactions. The cashing of a check by a bank upon which it is drawn effectually closes the transaction, retires the check, and discharges the liability of all parties

thereto. If an action such as this may be maintained against the indorser of a check, who knows nothing of its character, more than a year after it has been cashed by the bank upon which it was drawn, then it may be seen that the active business man may incur mounting contingent liabilities of which he knows nothing and his solvency become a matter of conjecture. This rule places upon the banker, he who is in the best position to discharge it, the burden of discovering the forgery, relieves prior parties of a contingent responsibility, effectually cancels and retires the check, and converts it into a mere voucher. It is in keeping with the general scheme and purpose of the Negotiable Instruments Act which calls for prompt notification to those who may be liable in case of the dishonor of the check or draft and promotes the usefulness of this medium of exchange. However, the Negotiable Instruments Act deals with the rights and liabilities of those who are legitimate parties to the instrument. It does not prohibit a bank from recovering from forgers, thieves, or from those who have no title to the instrument. *Title G. & T. Co. v. Haven*, 196 N. Y. 487, 492, 89 N. E. 1082, 1085.

It is, consequently, necessary to consider whether the defendant was a holder of the instrument in due course. It is undisputed that these checks were complete and regular upon their face; that he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it, and that he took it in the usual course of business. It is urged, however, that the fact that there was a discrepancy in each instance between the spelling of the name of the payee on the face of the check and of the indorser on the back of the check was sufficient to have put the defendant upon inquiry concerning the forgery, and that he should at least have required the identification of the payee. Upon this question, the custom prevailing in the city of Sheboygan with reference to cashing of pay-checks has a very important bearing.

The evidence shows that the Security National Bank, upon which these checks were drawn, required no identification whatever of those possessing similar pay-checks. They were cashed as a matter of course. A teller of that bank testified that if they required identification of all factory pay-roll checks they would not get through until twelve o'clock at night. It was a practical impossibility. It further appears not only by the testimony of this teller but by the cashier of the Farmers & Merchants Bank of Sheboygan and of Mr. Mueller, the paymaster of the Kohler Company, that discrepancies between the spelling of the name of a payee as it appeared on the face of a check and as indorsed on the back of a check were not uncommon on pay-checks, and that the banks ascribed little if any importance to such discrepancies. Mr. Mueller testified that the names of the employees of the Kohler Company were not infrequently misspelled upon their records, and that they used the indorsements on the returned checks to correct their own records with reference to the spelling of the names of their employees. The defendant had been in business in the city of Sheboygan for many years, and was frequently called upon to cash pay-checks issued by the Kohler Company. He presumably knew of this custom on the part of the banks in paying these checks without identification and of overlooking discrepancies between the spelling of the name of the payee on the face and on the back of the check. The checks were, concededly, very good imitations of the Kohler pay-checks, and, under all the circumstances, there is no room to question that he stands in the position of a *bona fide* holder of the checks.

*By the Court.*—Judgment affirmed.

FRITZ, J., took no part.

A motion for a rehearing was denied, with $25 costs, on January 7, 1930.