HUBER GLASS COMPANY, INC., Respondent, v. FIRST NATIONAL BANK OF KENOSHA, Appellant.

*November 2—November 30, 1965.*

For the appellant there was a brief by *Heide, Sheldon, Hartley & Thom* and *W. A. Sheldon,* all of Kenosha, and oral argument by *W. A. Sheldon.*

For the respondent there was a brief by *Hammond & Tennessen* and *Willis R. Hammond,* all of Kenosha, and oral argument by *Willis R. Hammond.*

WILKIE, J. The law concerning the duty of a bank towards its depositor was summarized in *Wussow v. Badger State Bank.*[2] Since their relationship is grounded in contract, a bank can only make payments from a depositor's account in accordance with proper authorization and is bound to restore any amount paid out on forged

---

[2] (1931), 204 Wis. 467, 234 N. W. 720, 236 N. W. 687.

checks. A bank can only avoid this strict liability where the "depositor is in equity estopped to assert that the bank is absolutely liable."[3] To do this successfully, the bank must show (1) that it was without fault in failing to detect the forgeries, and (2) that the depositor was negligent in causing the money to be paid. In the instant case the trial court found as a matter of fact that (1) the bank "was negligent in not detecting the forgeries," and (2) that the depositor "was not negligent." To enable the bank to prevail against the depositor's claim it must, on this appeal, demonstrate that both of these findings are against the great weight and clear preponderance of the evidence.[4]

Thus, the two issues presented on this appeal are:

1. Is the finding of negligence on the part of the bank against the evidence?

2. Is the finding of no negligence on the part of the depositor against the evidence?

### The Bank's Negligence.

Two bank officials, George Gehring and Rudolph Scuglik, explained the procedures employed by the bank when a check was presented for payment. When checks come in, they are totaled, listed, and sorted alphabetically in the proof department and are then routed to the bookkeeping department. There an employee, who is responsible for a particular alphabetical segment of accounts, examines each check for signature, date, amount, payee, and endorsement, and posts it to the appropriate account. The checks are then photographed, perforated, filed with others charged against the same account, and, at the end of the month, returned to the depositor. Every bookkeeping-department employee has a file containing signature cards for each of their de-

[3] Id. at page 474.
[4] *Philipp Lithographing Co. v. Babich* (1965), 27 Wis. (2d) 645, 135 N. W. (2d) 343; *Hope Acres, Inc., v. Harris* (1965), 27 Wis. (2d) 285, 134 N. W. (2d) 462, 135 N. W. (2d) 775.

positors and are trained to recognize the various signatures. The checks are actually compared with the cards until the employee becomes sufficiently familiar with the signature. The head of the bookkeeping department is notified in case of a discrepancy. Scuglik, who was in charge of the bookkeeping department, could not say that each of the checks in question was processed according to the prescribed manner, but he assumed that this was done as a matter of routine. There was no testimony which would even suggest that there was a breakdown of this system in regard to the checks in question. As to the forgeries themselves, an examination of the bogus checks, respondent's signature card, and several genuine checks which were introduced into evidence, demonstrates that "each forged signature was a reasonable facsimile of the genuine signature." [5]

The record establishes that the bank used a reasonable method to inspect and process the checks presented to it, and that the forgeries were not palpable or flagrant, as was the case in *Wussow*, where the bank was found to be negligent for failing to detect the obvious discrepancy in signatures. Thus, unless the mere fact that the forgeries did escape detection of itself raises an inference of negligence, the bank, in the absence of any affirmative evidence to the contrary, has sustained the burden of showing that it acted reasonably and with "due diligence." [6] Consequently there is no evidence to support the finding that the bank was negligent.[7]

[5] *Clarke v. Camden Trust Co.* (1964), 84 N. J. Super. 304, 312, 201 Atl. (2d) 762, 766.

[6] *Wussow v. Badger State Bank, supra,* footnote 2, at page 474. It should be noted that the rule as to who has the burden of proving that the bank was free of negligence has been changed by the Uniform Commercial Code, sec. 404.406 (3), Stats., providing that the burden is on the depositor to prove negligence by the bank as distinguished from the rule, applicable to the case at bar, that requires the bank to prove itself free of negligence.

[7] *Mt. Pleasant v. Racine* (1965), 28 Wis. (2d) 519, 137 N. W. (2d) 656.

## Negligence of Depositor.

Even if the bank is not guilty of negligence in failing to uncover the forgery, the depositor is nonetheless entitled to a restoration of the funds paid out in the absence of negligence on its own part.[8] Thus, the crucial question here is whether or not the depositor was negligent.

A depositor is bound to examine the checks and statements returned by the bank,[9] and this duty is violated when it neglects to do those things dictated by ordinary business customs and which, if done, would have prevented the wrongdoing.[10]

In *Wussow*, the court held that the depositor had a duty

".  .  . to examine his checks and the statement and discover whether the balance stated was correct and whether any forgeries were included and report any discrepancies in balance and any forgeries to the bank at once."[11]

It has been held that the reconciliation should include, as a minimum, the following steps: (1) A comparison of the canceled checks with the check stubs, (2) a comparison of the statement balance with the checkbook balance, and (3) a comparison of the returned checks with the checks listed on the statement.[12]

There is no question that in the case at bar the procedure employed by the respondent in checking the returned checks and bank statements did not comply with these suggested steps. On the contrary, the undisputed evidence showed that the checks returned to respondent

---

[8] *Wussow v. Badger State Bank, supra,* footnote 2.

[9] Id. at page 471.

[10] *Clarke v. Camden Trust Co., supra,* footnote 5; *Morgan v. United States Mortgage & Trust Co.* (1913), 208 N. Y. 218, 101 N. E. 871.

[11] *Wussow v. Badger State Bank, supra,* footnote 2, at page 471.

[12] *Clarke v. Camden Trust Co., supra,* footnote 5; *Stumpp v. Bank of New York* (1925), 212 App. Div. 608, 209 N. Y. Supp. 396; see also 10 Am. Jur. (2d), Banks, p. 479, sec. 512, and p. 569, sec. 604.

by appellant were received by Miller who made a preliminary examination of the statement. Presumably, the forged checks were removed from the others at this point. Then another employee of the bookkeeping department listed the checks numerically and determined the ones that were outstanding. After this, Miller would reconcile the bank statement with the check ledger. Huber got the checks at this point, but he testified that he never attempted to reconcile the bank statement with the books but left this task entirely up to Miller. When asked:

"*Q.* . . . You could have yourself taken the number of checks that were there, taped them, and added to it the outstanding checks and subtracted that from your total deposit and determined whether there was any discrepancy, could you not?"

Huber replied:

"*A.* I could have, but this is what I hired Mr. Miller to do."

Miller advised Huber that the accounts were in balance. Between April 2, 1962, and April 19, 1963, respondent's account was overdrawn on 14 different occasions. Although appellant mailed respondent a notice of overdraft each time, Huber did not recall having seen any of them. However, he did learn of the overdrafts from the monthly statement.

Miller's methods were such that a comparison of the statement balance with the checkbook balance or a matching of the canceled checks with the actual charges on the statement would have quickly disclosed a discrepancy. Likewise, a perusal of the canceled checks, which were numbered consecutively, would have revealed that certain checks were missing and had been missing for some time. Yet Huber admittedly never complied with any of the suggested reconciliation practices, and, in fact, left full responsibility to Miller.

No other employee was assigned to verify Miller's work. That there were 14 overdrafts in a year should have prompted Huber to investigate the state of his books even if ordinary business practices did not so persuade him. Under the circumstances, entrusting Miller alone with the job of reconciling the statements for three years, when a simple spot check of the records would have uncovered the forgeries, was unreasonable and the trial court's finding of no negligence is contrary to the great weight and clear preponderance of the evidence. Huber, however, takes the position that the president of a company which employs between 50 and 75 people, and which writes almost 13,000 checks a year, cannot be expected to personally examine and/or reconcile the books. But the president himself is not required to do this; the task can be delegated to another employee. Modern business practice dictates at least some semblance of internal control. Estoppel from claiming against the bank is the price of blind reliance on a single employee.

The earliest checks forged on the depositor's account by Miller appeared in August of 1960. Respondent's negligence in failing to employ proper reconciliation methods preceded the one-year period—April, 1962–1963 —embraced by the depositor's claim and he is estopped from asserting a claim against the bank for any check embraced in the lower court's judgment.

Other courts have arrived at the same conclusion upon similar facts. In *Clarke v. Camden Trust Co.*[13] the depositor never made an attempt to reconcile his bank statement himself but left this job entirely to his trusted secretary. After the secretary mysteriously disappeared, it was learned that she had forged 41 checks over a four-year period. The depositor was precluded from recovering from the bank because "any kind of reasonable examination"[14] would have detected the forgeries. In *Morgan*

---

[13] *Supra,* footnote 5.

[14] *Clarke v. Camden Trust Co., supra,* footnote 5, at page 766.

*v. United States Mortgage & Trust Co.,*[15] a clerk who made deposits, wrote out checks, and received the canceled checks and statements from the bank, forged several checks on a trust account. As an examination, the trustees matched the genuine checks, which the clerk submitted to them, with the checkbook. The court held that the trustees-depositors failed in their duty of examination by not at least comparing the canceled checks with the statement or passbook returned by the bank.

*By the Court.*—Judgment reversed.