WINKIE, INC., Plaintiff-Appellant, v. HERITAGE BANK
OF WHITEFISH BAY, Defendant-Respondent.†

Court of Appeals

*No. 77–404. Oral argument January 24, 1979.—*
*Decided October 12, 1979.*
(Also reported in 285 N.W.2d 899.)

† Petition to review granted.

For the plaintiff-appellant, the cause was submitted on briefs and oral argument by *James C. Schalow.*

For the defendant-respondent, the cause was submitted on briefs and oral argument by *Gregory Gramling, Jr.*

Before Decker, C.J., Robert W. Hansen and Lewis J. Charles, Reserve Judges.

DECKER, C.J. The plaintiff, Winkie, Inc., is a commercial enterprise and Wilbur J. Winkie, Jr., is its president. Winkie, Inc., maintained a checking account in the Heritage Bank of Whitefish Bay. Although several persons were authorized to sign checks, W. J. Winkie, Jr., was the only person who ever signed checks drawn upon the account.

Doris Britton, a secretarial employee of Winkie, Inc., recorded invoices for supplies and services rendered to the company, and presented the invoices and checks drawn upon the account in payment of the invoices to W. J. Winkie, Jr., for review of the invoices and execution of the checks. In the years 1965 to 1973, Doris Britton forged the signature of W. J. Winkie, Jr., to hundreds of checks totaling $148,171.30 drawn upon the Winkie, Inc., account. In addition to forging the signature of W. J. Winkie, Jr., Doris Britton forged the indorsements of the payee on many of the checks.

None of the payees of the checks supplied services or materials to Winkie, Inc., for which the forged checks were payment, and Winkie, Inc., neither intended payment nor received benefit of any kind by reason of the issuance of the checks. Doris Britton directly or indirectly received all of the proceeds of the forged checks.

In 1973, after approximately eight years of repeated forgeries, W. J. Winkie, Jr., discovered a forged check and immediately notified the bank. During the eight-year period, W. J. Winkie, Jr., did not personally examine the Winkie, Inc., checks nor reconcile the bank statements of the account. Another Winkie, Inc., employee, not alleged to be involved in the systematic forgeries, was assigned those duties. Winkie, Inc., utilized the services of a certified public accountant, but such services did not

expressly include bank statement reconciliation or an audit. Thus, the bank account examination and reconciliation was left to a single unsupervised Winkie, Inc., employee.

The trial court, in an exhaustive opinion in which it detailed the evidence adduced at trial, found that Winkie, Inc., was negligent because of its obvious failure to examine the checks drawn on the bank account. In arriving at that conclusion which was supported by overwhelming and virtually undisputed evidence, the trial court properly relied upon the duty expressed in *Wussow v. Badger State Bank,* 204 Wis. 467, 471, 234 N.W. 720, 721 (1931) that a depositor is obligated to "examine his checks and the statement and discover whether the balance stated was correct and whether any forgeries were included and report any discrepancies in balance and any forgeries to the bank at once." Our supreme court again indorsed the view that the "duty [to examine the bank checks and statement] is violated when [the depositor] neglects to do those things dictated by ordinary business customs and which, if done, would have prevented the wrongdoing." *Huber Glass Co. v. First Nat. Bank of Kenosha,* 29 Wis.2d 106, 111, 138 N.W.2d 157, 160 (1965).[1]

In a case similar to this, *Huber* noted that "[m]odern business practice dictates some semblance of internal control"[2] and criticized "blind reliance on a single employee."[3] Winkie, Inc., disputes the trial court's negligence

---

[1] *Wussow* and *Huber* are cases that arose before the adoption of the Uniform Commercial Code. The pertinent provisions of the cases remain applicable pursuant to sec. 404.406; however, subsection (3) shifts the burden to the customer to prove that the bank did not exercise due care.

[2] *Huber, supra* at 113, 138 N.W.2d at 162.

[3] *Id.*

finding and contends that assigning the bank statement reconciliation to another employee and the employment of the C.P.A. was the kind of internal control that was absent in the *Huber* case. We disagree because the C.P.A. was not assigned those duties and for the further reason that the "other employee" was the sole employee to which internal control was assigned. Although there was misplaced reliance upon Doris Britton, that reliance was solely upon the honest performance of her duties in presenting invoices and preparing checks in payment of appropriate invoices. She was not relied upon to exercise internal control over disbursements from the bank account to comply with the duty of Winkie, Inc., to its bank.

■

W. J. Winkie, Jr., testified that Britton's forgery of his signature was so skillful that he could not be certain whether or not he signed the check, identified as Exhibit 4. We find no merit in the contention of Winkie, Inc., that failure to examine the checks was inconsequential because the forged signature was undetectable. The forger's skill in excuting the purported drawer's signature on one check or even many checks is but one aspect of the "semblance of internal control" that will aid in the detection of forgeries, and not the sole form of negligent conduct of a depositor.

The second dispositive finding by the trial court was that the Heritage Bank of Whitefish Bay was not negligent in paying the forged checks and charging them to the account of Winkie, Inc.

■

Winkie, Inc., contends that the bank was negligent for failure to inquire about the circumstances concerning the issuance of several of the forged checks in which the Heritage Bank of Whitefish Bay was the payee and the check proceeds were applied to Doris Britton's indebtedness to that bank. In its contention, Winkie, Inc., relies upon the responsibility of a bank to inquire when a fi-

duciary makes withdrawals by check from his fiduciary account in a bank and applies them directly to his personal indebtedness to the bank. *Schneider Fuel v. West Allis State Bank,* 70 Wis.2d 1041, 236 N.W.2d 266 (1975). Reliance upon *Schneider* is misplaced because Doris Britton was not a fiduciary, and if she were, it was not known by, or apparent to, the bank.

Another Winkie, Inc., contention is that the bank was negligent in not properly examining the forged checks to ascertain the payee and whether there was alteration of the instruments. Our review of the record leads us to conclude that the evidence supports the trial court's conclusion that the bank fulfilled its duty under secs. 403.-102(1)(b) and 403.110(1), Stats., to properly ascertain the payee and the payment order without negligence on its part.

The last and most complex of the contentions of Winkie, Inc., that the bank was demonstrably negligent, is grounded upon the evidence that the bank, in posting the presented checks to the account of Winkie, Inc., failed to examine those checks to ascertain whether the checks were properly indorsed. The evidence establishes that one of the forged checks was paid by the bank, although there was no indorsement by the payee. Additionally, an employee of the bank testified that it was the bank's policy not to examine a check to ascertain the existence of a proper indorsement unless the check was for $1,000 or more.

There is a multifaceted significance to this contention and its relationship to the other issues that we have addressed. First, if Winkie, Inc., was not negligent in its failure to discover the forged checks, then the bank would bear the liability for paying the forged checks because it honored unauthorized payments from the depositor's account. That result is commanded by the common-law doctrine established in *Price v. Neal*[4] and codified suc-

---

[4] 3 Burr. 1354, 97 Eng. Rep. 871 (K.B. 1762).

cessively in the Negotiable Instruments Law[5] and the Uniform Commercial Code.[6] Second, if Winkie, Inc., was negligent, as determined by the trial court and confirmed by this court, such negligence does not bar its recovery from the bank if the latter was also negligent.[7] Third, if Winkie, Inc., can recover because the bank is also negligent, the appropriate application of the "twin" statute of limitations[8] is presented. Section 404.406(4), Stats., prescribes a one-year statute of limitations on recovery by a depositor from a bank for an improper charge against its account arising from the forgery of the drawer's signature and also prescribes a three-year statute of limitations on recovery from the bank by reason of its negligence in failing to discover forged indorsements. Because of the different limitation periods, further complications appear to be presented. For example, are the limitation periods in the case of "double forgeries"[9] mutually exclusive or inclusive? Are the periods of limitation to be "tacked"? In a double-check forgery, is the failure of the bank to ascertain whether the check is appropriately indorsed relevant to whether the loss should be borne by the depositor or the bank?

We were troubled by the applicable limitations period and the loss-causation questions which were not discussed in the parties' original briefs. Consequently, we ordered briefing of those questions. Our research has led us to the conclusion that the loss-causation rationale resolves the concluding issue of this case.

---

[5] Sec. 116.67, Stats., 1961.

[6] Sec. 403.418, Stats.

[7] Sec. 404.406(3), Stats.

[8] Sec. 404.406(4), Stats.

[9] The term is used to refer to a check which bears a forged signature of the drawer and a forged indorsement of the payee who was not intended by the drawer to have any interest in the check.

Although the trial court found that the bank was not negligent in failing to examine the forged checks for proper indorsements, we, nonetheless, assume for the purposes of this case, that systematic failure to examine checks in amounts under $1,000 for proper indorsements constituted a negligent breach of its duty to ascertain whether the checks were "properly payable" and therefore, chargeable against the depositor's account pursuant to sec. 404.401(1), Stats. In this respect we detect a perceptible shift in the thrust of the argument made to us from that addressed in the trial court's opinion. The evidentiary thrust at trial on this issue was directed to alterations to the checks. Upon the basis of the evidence, the trial court rejected the position of Winkie, Inc. The latter's contention now under consideration is framed in terms of negligence as a matter of law for failure to examine the checks for proper indorsement. The bank seeks comfort from a quotation by our supreme court in *West Side Bank v. Marine Nat. Exchange Bank,* 37 Wis.2d 661, 675, 155 N.W.2d 587, 594–5 (1967), from an authoritative law review article:

One is that the rules must be suitable for a bulk processing of large numbers of checks at little cost. The second, which is a corollary of the first, is that rules to ensure a proper allocation of losses incurred in the area of the one eighth of one percent of bad items should not be so restrictive as to clog the free flow and smooth handling of the almost unanimous number of *good checks, collections in bulk, and deferred posting.* [Emphasis in original.]

The quotation was utilized in the context of explicating the duties of a payor bank to a collecting bank[10] in settling collection accounts between the payor and collecting bank and does not address the right of a bank

---

[10] By virtue of sec. 404.105(4), Stats., the term "collecting bank" includes an "intermediary bank" as defined in sec. 404.105 (3).

to charge its depositor's account pursuant to sec. 404.-401(1), Stats.

If it is assumed that the bank was negligent for failure to examine the checks for proper indorsements, Winkie, Inc., contends that its loss occurred by reason of the forged indorsements, and that it should be permitted to recover $92,447.11 from the bank attributable to checks bearing forged indorsements which were paid within the three-year limitation period.[11] We disagree and hold that the loss was not occasioned by the forged indorsements.

The rule of *Price v. Neal* prevents the payor bank from recovering its payment to a collecting bank or other good-faith party, where the drawer's check signature was forged.[12] However, that rule is inapplicable where the check bears a forged indorsement. The doctrine of *Price v. Neal* favors a commercial policy of convenience and finality over principles of unjust enrichment. When a case involves a double forgery, as this one does, is the recovery to be determined upon the basis of the forged indorsement or the forged drawer's signature? The answers to that question have been varied in other jurisdictions.

In this case, Winkie, Inc., relies upon *Bank of Thomas County v. Dekle*, 119 Ga. App. 753, 168 S.E.2d 834 (1969) which permits recovery by the depositor from the bank upon double forgeries for the period prescribed by the

[11] We need not complicate this opinion by reference to the fourteen-day post-bank statement period contained in sec. 404.406 (2) (b), Stats., which is inapplicable to this case by virtue of sec. 404.406(3) because we assume negligence upon the part of the bank.

[12] For example, *see Fidelity & Casualty Co. v. Planenschek*, 200 Wis. 304, 227 N.W. 387, 71 A.L.R. 331 (1930) which applies the Wisconsin negotiable instrument law statute which codified the rule of *Price v. Neal*.

statute of limitations applicable to forged indorsements. Winkie, Inc., reasons that the loss occurred not by the issuance of the forged check, but by its negotiation through the forged indorsement. Wisconsin has rejected that reasoning for almost twenty-five years for reasons which were not discussed by the Georgia Court of Appeals.

Section 9(3) of the Uniform Negotiable Instruments Law stated, "The instrument is payable to bearer . . . (3) When it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable." The rule codified the common law.[13] Under this N.I.L. provision, a check made payable to a fictitious payee and bearing an indorsement in the name of the fictitious payee was construed as a check payable to bearer so that no indorsement was required for negotiation and transfer of good title. Consequently, the forged indorsement was surplusage and provided no basis for recovery against a collecting bank. As put in *Brady on Bank Checks*, "[w]hat the defendant bank actually got was good title to a forged check (a check bearing a forged drawer's signature)."[14] The same rule is also appropriate where recovery is not sought from a collecting bank but, as in this case, the depositor barred from recovery against the payor bank by the depositor's negligence, seeks to recover from the payor bank upon the theory that the loss originated from the forged indorsement.

---

[13] *Minet v. Gibson*, 3 T.R. 481, 100 Eng. Rep. 689 (K.B. 1789), *affirmed* 1 H.Bl. 569, 126 Eng. Rep. 326 (H.L. 1791); *Hortsman v. Henshaw*, 52 U.S. (11 How.) 177 (1850); *Foster v. Shattuck*, 2 N.H. 446 (1822); *Coggill v. American Exchange Bank*, 1 N.Y. 113 (1847).

[14] Bailey, *Brady on Bank Checks*, §15.16, p. 509 (4th Ed. 1969).

Wisconsin reached this conclusion by a parallel route without citing the codifying statute.[15] In *Fidelity & Deposit Co. v. Peoples Exchange Bank,* 270 Wis. 415, 71 N.W.2d 290 (1955) our supreme court relied upon quotations from a law digest and one of its earlier decisions that in effect summarized the rule of *Price v. Neal:*

The more recent decisions apply the first principle and hold that a forgery of the drawer's signature renders the instrument invalid from its inception and that the drawee bank may not recover, even though the payee's indorsement is forged.[16]

and:

The cashing of a check by a bank upon which it is drawn effectually closes the transaction, retires the check, and discharges the liability of all parties thereto. . . . This rule places upon the banker, he who is in the best position to discharge it, the burden of discovering the forgery, relieves prior parties of a contingent responsibility, effectually cancels and retires the check, and converts it into a mere voucher.[17]

The supreme court did not cite the codified rule that if made payable by a forger to fictitious persons, or the

[15] Sec. 9(3) of the Uniform Negotiable Instruments Law was adopted in Wisconsin and effective at the time the supreme court reached this conclusion in the following form:

116.13   Payable to bearer, when. The instrument is payable to bearer:

. . . .

(3) When it is payable to the order of a fictitious or nonexisting or living person not intended to have any interest in it, and such fact was known to the person making it so payable, or known to his employee or other agent who supplies the name of such payee; . . .

The statutory addition to the subsection effects no substantial change in the uniform law because it merely codifies prior interpretations of the subsection.

[16] II Patton's Digest, Forged Paper, sec. 7:1, p. 1869.

[17] *Fidelity & Casualty Co., supra* note 12 at 309–10, 227 N.W. at 389, 71 A.L.R. at 335–6 (1930).

equivalent—real persons not intended to have an interest in it, the check is therefore payable to the bearer and requires no indorsement.[18] Nonetheless, the court in *Fidelity & Casualty Co.*,[19] arrived at the quoted conclusion by expressly relying upon that codified rule.

Effective July 1, 1965, Wisconsin adopted the Uniform Commercial Code. Professor Baker, noting that the Code achieves the same result as the N.I.L. by a different method, explains succinctly:

> In actuality, the inquiry under Section 9(3) of the Negotiable Instruments law was only superficially whether the named payee was fictitious; the more fundamental inquiry was whether the party drawing the check intended the named payee to receive no benefit from it. In recognition of this, the Code drafters worded Section 3-405 to reflect the fundamental inquiry rather than the superficial one. The section makes no mention of fictitiousness, but rather states that the indorsement is effective if "the person signing as or on behalf of a . . . drawer intends the payee to have no interest in the instrument." Comment 3 to Section 3-405 makes it clear that the test is no longer "whether the named payee is 'fictitious' but whether the signer intends that he shall have no interest in the instrument." And Comment 1 points out that fictitiousness remains significant under Section 3-405 only to the extent that the use of a fictitious name "may bear on the intent [by the party drawing the check] that [the named payee] shall have no interest in the instrument." Nevertheless, old terminology dies slowly, and Section 3-405 is commonly (and misleadingly) referred to today as the "fictitious payee rule."

Although the Code drafters discontinued the fiction that a check to which the "fictitious payee" rule applied

---

[18] For a more extensive discussion, *see:* Baker, "The *Perini* case: Double Forgery Revisited" (Parts I and II), 10 Uniform Commercial Code Law Journal 309 (1979) and 11. Uniform Commercial Law Journal 41 (1979); O'Malley, "The Code and Double Forgeries," 19 Syracuse L. Rev. 37 (1967).

[19] *Fidelity & Casualty Co., supra* note 12.

was bearer paper, they achieved the same effect in a more forthright manner by stating flatly that Section 3–405, when applicable, makes the indorsement in question "effective." This means that even though the indorsement is forged or otherwise unauthorized, it does not render collecting banks liable for breach of warranty under Section 4–207 (1) (a) or drawee banks liable for recredit of the drawer's account under Section 4–401. Since the end result is the same as that produced by the old "fictitious payee" rule, it is still commonly said that where Section 3–405 applies, the forged indorsement "is not a forged indorsement." This of course is not so; the forged indorsement is still a forgery. It simply does not have the *effect* of a forgery for purposes of imposing liability on banks handling the check. [Emphasis in original.][20]

We hold that sec. 403.405 (1) (b), Stats., controls this case. Because the forger of the checks, upon which the indorsements were forged, intended the payee to have no interest in the checks, an indorsement by any person was effective. Thus, the loss occurred not from the assumed negligence of the bank in failing to examine the checks for proper indorsements because *any* indorsement was effective.[21] The negligence of Winkie, Inc., precludes its recovery from the bank and sec. 404.406 (3) does not relieve Winkie, Inc., from the preclusion of sec. 404.406 (2). The result is consistent with sec. 116.13, Stats., applicable when *Fidelity & Deposit Co., supra,* and *Fidelity & Casualty, supra,* were decided and consistent with the specific decision of that case embody-

[20] *Baker, supra* note 18, at 328–29. [Footnotes omitted.]

[21] In *Aetna Life and Casualty Co. v. Hampton State Bank,* 497 S.W.2d 80 (Tex. Ct. App. 1973), the court applied U.C.C. §3–405(1) (b) without any showing that the wrongdoer was a member of the drawer's organization. In *First Pennsylvania Bank & Trust Co. v. Montgomery County Bank & Trust Co.,* 29 Pa. D. & C.2d 596 (1962), 1 U.C.C. Rep. 291, the same section was applied to a double forgery by a comptroller of the drawer's organization.

ing the finality policy, sec. 403.418.[22] The three-year limitation provided by sec. 404.406(4) is therefore inapplicable to the plaintiff's claim.

*By the Court.*—Judgment affirmed.

---

[22] The finality rationale is properly relevant only to the question of recovery against collecting banks. In a pre-Code case the United States Supreme Court applied the same rationale of final payment and loss-causation in *United States v. Chase National Bank*, 252 U.S. 485 (1920).

