WINKIE, INC., Plaintiff-Appellant-Petitioner,

v.

HERITAGE BANK OF WHITEFISH BAY, Defendant-Respondent.

Supreme Court

*No. 77–404. Argued September 29, 1980.—Decided January 6, 1981.*

(Also reported in 299 N.W.2d 829.)

For the appellant-petitioner there were briefs and oral argument by *James C. Schalow* of Menomonee Falls.

For the respondent there were briefs and oral argument by *Gregory Gramling, Jr.,* of Milwaukee.

HEFFERNAN, J. This review stems from a trial court action in which Winkie, Inc., sued its bank, the Heritage Bank of Whitefish Bay, for paying checks not properly payable. It was stipulated that, during the period from 1965 to 1973, Heritage had paid forged checks drawn on the Winkie account in the amount of

$148,171.30. On each of these checks, Doris Britton, an employee of Winkie, forged the signature of W. J. Winkie, Jr., the company president. Checks totaling $55,724.19 were single forgeries, in that only the signature of the maker, W. J. Winkie, Jr., was forged. These forged checks generally named Doris Britton as payee, and she passed them by signing her own name as indorser.[1] Checks totaling $92,447.11 were double forgeries, in the sense that the maker's signature was forged and the checks were transferred by Doris Britton's forged indorsement of the named payee.[2] At least one forged check was paid by Heritage without indorsement. None of these checks were issued in payment for goods or services provided to Winkie, Inc.; and Winkie, Inc., neither intended payment nor received benefit of any kind by the issuance of these particular checks. Doris Britton was the sole beneficiary, directly or indirectly, of the proceeds of all the forged checks. Two checks, on which the Heritage Bank itself was the payee, were used by her to pay her personal obligations to the bank.

On May 10, 1973, after eight years of repeated forgeries, irregular procedures employed by Doris Britton were called to the attention of W. J. Winkie, Jr., by another secretarial employee. He immediately investigated, discovered a forged check, and notified the bank; and this led to the discovery of the series of forgeries dating back over a period of eight years. Hundreds of checks were found to have been forged.

Although the Heritage Bank each month sent a statement of account to Winkie, Inc., together with the paid items, W. J. Winkie, Jr., whose signature, false or other-

---

[1] Some, however, named other persons or institutions as payee and were properly indorsed thereby. Nonetheless, even the proceeds of those checks indirectly inured to Doris Britton's benefit.

[2] Most of these "double-forged" checks also have an additional indorsement in Doris' own name, following the forged indorsement of the named payee.

wise, appeared on all the checks, did not examine the statements or the checks and did not reconcile the checking account balance with the balances shown on the bank statements.

At trial, the procedure used in issuing checks and reviewing paid checks was thoroughly explored. One of Doris Britton's principal duties was the preparation of checks on the basis of suppliers' invoices. She apparently verified the invoices and prepared the checks which were to be paid to Winkie suppliers.

The record shows that, whenever accounts were to be paid, bona fide checks were submitted by Doris Britton to W. J. Winkie, Jr., for his signature. His signing was perfunctory in nature. He did not check invoices or the sequence of check numbers. He merely determined that the checks on their face appeared to be proper in form and that the numerical figures agreed with the typewritten face value of the checks.

Doris Britton, two or three times a month on the average, using numbered Winkie, Inc., checks and the Winkie checkwriter, forged W. J. Winkie's signature on checks naming herself as payee, or on checks to payees who were not intended to receive the proceeds of the checks.[3] This latter category of checks was transferred by Doris Britton by forging the indorsements of the named payees and, in most cases, adding her own name as indorsee.

The trial court in its opinion exhaustively reviewed the internal operating procedures of Winkie, Inc. The only internal control of the check issuing and the reconciliation procedure was left to Lyle Britton, Doris' husband. However, Winkie never instructed Lyle Britton to reconcile the bank statements nor in the proper means of

---

[3] A number of checks in this latter category bore, in addition, alterations to, or erasures of, the named payee.

doing so; and, as far as the record shows, Lyle Britton never reconciled the balance shown on the statement with the office checkbook records or compared the cancelled checks with the numerical sequence of checks issued or with the office's carbon duplicates of the original checks. His job was to post the checks in the books. It is not clear whether this duty encompassed the posting of checks only after they were paid by the bank or whether he was responsible for some record in respect to the checks as they were prepared prior to delivery to the payees.

The forgeries of Winkie's signature were reasonable facsimiles. Winkie indicated that, from the signatures alone, he would not in all cases know that the signatures were not his. The evidence was uncontradicted that a bank, in the exercise of ordinary care, would not have detected the forgeries.

Although a firm of certified public accountants performed some services for Winkie, Inc., the contract under which it was hired did not provide for bank statement reconciliation or item examination. The record shows that no one in the Winkie organization was instructed to examine bank statements or the cancelled items when they were returned. Winkie testified that he assumed that an accountant, earlier employed, had fully instructed Lyle Britton in his duties. To the extent that the returned checks and bank statements were given any review, such review was by Lyle Britton, who was uninstructed and unsupervised in respect to the reconciliation of the checking account and examination of the paid items.

It should be noted that, despite the husband-wife relationship between the forger and the only person charged with any duties with respect to the cancelled checks, there is no claim that Lyle Britton was implicated in the fraudulent scheme.

The trial court found that Winkie, Inc., was negligent for its failure to examine the cancelled checks and the statements returned by the bank and was negligent in failing to make any kind of examination that could have led to the detection of the forgeries or check alterations. It additionally found that the Heritage Bank was not negligent in respect to paying any of the checks, and that the bank had exercised reasonable care and prudence in the processing and payment of the Winkie checks. It concluded that the Heritage Bank was not liable for any of the forged or altered items charged against the Winkie account.

Although the testimony revealed that the Heritage Bank, as a matter of policy, did not check indorsements on checks with a face value of less than $1,000, the trial court found that the bank was not negligent in failing to do so. Judgment, accordingly, was entered dismissing Winkie's complaint.

The Court of Appeals[4] affirmed the judgment of the trial court. In so doing, it sustained the trial court's finding of fact that Winkie, Inc., was negligent because of its failure to examine the cancelled checks drawn on the bank account. It further sustained the trial court's finding that Winkie, Inc., was negligent in failing to establish a reasonable procedure of control after the checks were returned.

We do not reexamine these determinations of the Court of Appeals that the trial court's findings were founded upon sufficient evidence. The Court of Appeals had full access to the record, and this court will not reexamine Court of Appeals' determinations where a question of law is not specifically implicated. We ordinarily would not take a case on review which involved only the ques-

[4] *Winkie, Inc. v. Heritage Bank of Whitefish Bay,* 92 Wis.2d 784, 285 N.W.2d 899 (Ct. App. 1979).

tion of sufficiency of the evidence. We reserve for further discussion in this opinion the effect of the bank's failure to examine indorsements on checks bearing a face value of less than $1,000. In respect to that issue, the petitioner's contention is that the bank was negligent as a matter of law.

The Court of Appeals also held that Heritage was not negligent in failing to inquire about the issuance of several checks in which Heritage itself was the payee and the proceeds were applied to Doris Britton's personal indebtedness. It correctly concluded that the rule of *Schneider Fuel v. West Allis State Bank,* 70 Wis.2d 1041, 236 N.W.2d 266 (1975), was inappropriate, because Doris Britton was not a "fiduciary" in the sense that term was used in the *Schneider* case.

To put this case in perspective, it is necessary to review provisions of the Uniform Commercial Code which determine the rights and obligations of banks and their customers. We start out with the proposition that a drawee bank is presumptively liable to its customer, the drawer, for paying an item that is not "properly payable." Sec. 404.401 (1), Stats. This means that a drawee bank is liable when it honors an altered check or a check bearing a forged maker's signature or a signature which is unauthorized. Secs. 403.401 (1), 403.404 (1), and 401.-201 (43), Stats. It is undisputed that each of the checks paid by Heritage bore a forged maker's signature and that, accordingly, the bank was presumptively liable and obliged to recredit the account of the customer upon the discovery of the forgery.

Because of this "strict liability" as between a drawee bank and a drawer customer, the loss must be assumed by the bank. O'Malley, *Common Check Frauds and the Uniform Commercial Code,* 23 Rutgers Law Rev. 189, 195 n. 38 (1969), points out:

"When a bank has made such an improper payment, it is said to have paid out its own money and not that of the depositor. In *Grubnau v. Centennial Nat'l Bank,* 279 Pa. 501, 504, 124 A. 142, 143 (1924), the Supreme Court of Pennsylvania said: 'The bank received plaintiff's money for deposit, which it was under contract to return when called for. In honoring the forged check it used its own money, not the depositor's, . . .' "

Although a bank is liable under its contract of deposit, nevertheless the drawer may be precluded from asserting the bank's liability because of equitable principles akin to estoppel which have been incorporated into the Uniform Commercial Code. The first of these arguably applicable preclusions appears in sec. 403.406, Stats. That section of the statutes provides that:

"Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee . . . who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's . . . business."

Neither the trial court nor the Court of Appeals specifically addressed itself to the question of Winkie, Inc.'s negligence in "substantially contributing" to the making of an unauthorized signature and, on the basis of the record, it would be inappropriate for this court to do so. It is sufficient to point out in passing that this first preclusion of a drawer's claim would arise from negligence of the drawer in the process by which the check was issued, that is, prior to the presentment and payment of the checks. The trial court alluded to such negligence when, in its findings of fact, it stated that the use of the checkwriter and the checks was entrusted by Winkie, Inc., to an employee without supervision and without any

security measures. The trial court's findings of fact, however, fell short of making the finding that this substantially contributed to the bad checks and did not conclude that Winkie's pre-issuance negligence precluded any claims against the drawee bank. It perhaps could have done so on the basis of the record;[5] and such a finding, if properly supported by the evidence, would have precluded any claim by Winkie in respect to any unauthorized signature or alteration.

The trial court found that the bank acted in good faith in accordance with reasonable commercial standards in examining the checks to determine whether the maker's signature was genuine. The record shows that the forgery was skillful and that the checks which were forged, as well as those which were altered, would have escaped detection by a drawee bank in the exercise of ordinary care. The trial court finding that the bank was not negligent in this respect was approved by the Court of Appeals.

---

[5] *See, e.g.,* Official Comment 7 to U.C.C. sec. 3–406, stating that the most obvious case of drawer negligence "substantially contributing" to the making of an unauthorized signature, and precluding the drawer's recovery from the drawee bank, is the situation where the drawer "makes use of a signature stamp or other automatic signing device and is negligent in looking after it." The section also covers situations where the drawing party "has notice that forgeries of his signature have occurred and is negligent in failing to prevent further forgeries by the same person." *Id. See also* J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 626 (2d ed. 1980) :

"The acts sufficient 'substantially to contribute' to a material alteration or to the making of an unauthorized signature are limited only by the limits of man's capacity for conducting slovenly business transactions."

Examples given include failure to have books audited and failure to follow general business practices of organizations of similar size and sophistication. *Id.* at 627.

Nevertheless, whether the bank was negligent or not, the forged checks were not "properly payable," and the bank is obligated to recredit the drawer's account unless one of the preclusions applies. As pointed out above, the preclusion of sec. 403.406, Stats. (pre-issuance negligence by Winkie, Inc.), was not found by the trial court to be applicable.

A second preclusion was found applicable. That preclusion appears in sec. 404.406(1) and (2), Stats. Unlike the preclusion first referred to, this section estops the maker of a check from asserting its claim when it has failed in its duty to discover forgeries or alterations *after* the return of the bank statement and the paid items.

It was undisputed that the Heritage Bank sent Winkie, Inc., a monthly statement of account accompanied by the cancelled checks. Under sec. 404.406(1), Stats., Winkie, Inc., was obligated to "exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item . . . ." There is no contention that Winkie, Inc., exercised reasonable care and promptness, nor could there be, for the undisputed facts show that, beyond the minimal steps apparently taken by Lyle Britton and discussed above, there had been no examination of the statements and returned items for at least eight years.

Thus, irrespective of the presumptive liability of the bank for its payment of checks not properly payable, Winkie, Inc., was precluded by the provisions of sec. 404.406(2)(a), Stats., from asserting any claim in respect to unauthorized signatures or alterations if the bank established also that it suffered a loss by reason of the customer's failure. For this preclusion to apply, the bank itself must be free of negligence. Sec. 404.406(3). As stated above, the bank, in a technical sense sufficient

to satisfy the Uniform Commercial Code, "suffers a loss" whenever it pays a check or other item not properly payable because it cannot charge the item to the customer. Furthermore, a bank could prove that it suffered a loss because a delay by the drawer in failing to report forgeries or altered checks makes it impossible for the bank to promptly proceed against the wrongdoer to recover the losses. In the case before the court, Doris Britton's forgeries went unreported for eight years. The record shows that, when the forgeries and alterations were reported, she was insolvent and uncollectible. Had the customer acted promptly in 1965, the collection prospects of the bank against Doris Britton would have been immeasurably improved. *See* Hawkland, *A Transactional Guide to the Uniform Commercial Code* 407 (1964).

However, in the absence of whatever preclusions may be appropriate in the instant case, the Heritage Bank would sustain the loss in respect to all checks which were altered or which bore unauthorized signatures.

Sec. 404.406(2)(b), Stats., establishes a specific preclusion where the forgeries and alterations are made by the same wrongdoer. That section provides for a preclusion:

"If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by sub. (1) the customer is precluded from asserting against the bank:
"An unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding 14 calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration."

Hawkland states that sec. 404.406(2)(b), Stats.:

". . . conclusively assumes that forgeries and alterations committed by the same wrongdoer are made possi-

ble by the customer's failure to discover and report earlier mischief, and the customer is precluded from asserting these subsequent alterations and forgeries even if the bank cannot prove that it suffered a loss by reason of this failure." *Hawkland, supra,* at 407.[6]

The preclusion of sec. 404.406(1) and (2), Stats., does not apply if the bank is negligent. However, the trial court's finding, sustained by the Court of Appeals, was that the bank was not negligent in respect to the unauthorized maker's signatures or alterations by Doris Britton. Because the bank was not negligent, and because the same wrongdoer was responsible for each of the items not properly payable, and because no notification was given to the bank within fourteen days after the first forged item was returned to Winkie, Inc., Winkie is precluded from any claim against Heritage Bank for checks forged or altered by Doris Britton.[7]

The preclusion of sec. 404.406(1) and (2), Stats. (the fourteen-day provision, sub. (2)(b)), applies only to instances where the item is not properly payable because of

[6] *See also* Official Comment 3 to U.C.C. sec. 4–406 (rule of customer's preclusion under sub. (2)(b) "follows substantial case law that payment of an additional item or items bearing an unauthorized signature or alteration by the same wrongdoer *is a loss suffered by the bank traceable to the customer's failure to exercise reasonable care in examining his statement and notifying the bank of objections to it."* (Emphasis supplied) The rule is designed to keep down losses caused by the opportunity for a wrongdoer to repeat his misdeeds; "to avoid dispute a specific time limit for action by the customer is designated, namely fourteen calendar days"). *See also* Bailey, *Brady on Bank Checks,* sec. 26.13, p. 26–7 (5th ed. 1979).

[7] The record appears to indicate that the parties stipulated that Heritage Bank would assume responsibility for the payment of items returned to Winkie in the fourteen-day period prior to the notification of forgery in 1973. We do not determine whether this stipulation appropriately reflects the obligation of the bank in respect to those checks.

an unauthorized signature or an alteration. It does not address the duty of the maker of the check to act with reasonable promptness or within a specified period in respect to forged indorsements. In the case before us, all of the checks bore a forged maker signature and a great many bore, in addition, a forged indorsement.

The Uniform Commercial Code, sec. 404.406 (4), Stats., provides for a preclusion of claim where the customer has failed to report a forged indorsement within a period of three years.[8] This preclusion period is not a statute of limitations in the usual sense of the word. It is rather a statutory period which invokes the doctrine of laches or equitable estoppel. It would appear that, if notification of a forged indorsement is given to the bank within the three-year period, the customer would have the usual contract period of limitations of six years to commence an action against the bank. *See* Helstad, *Wisconsin Uniform Commercial Code Handbook,* sec. 9.15 (6), p. 9–19 (1965). This separate treatment of indorsements in the Uniform Commercial Code poses the question of whether those checks in the instant case bearing "double" forgeries (both maker and indorser) are to be treated as altered or forged *maker* signature items under sec. 404.406 (1) and (2), or as forged *indorsements* under sec. 404.406 (4).[9] As we have pointed out above, under the facts of this case, claim for items bearing forged maker signatures or which have been altered are precluded by the provisions of sec. 404.406 (1) and (2) (b)

[8] A similar preclusion, based on *one* year's duration, applies to unauthorized maker-signatures and to alterations. Sec. 404.406 (4), Stats.

[9] This problem does not arise, of course, in connection with those checks forged only as to *maker*-signature and otherwise properly indorsed and negotiated by the named payee. These checks are clearly governed by sec. 404.406 (1) and (2) alone, and claim is precluded by the fourteen-day provision.

because of noncompliance with the fourteen-day rule. If, however, the loss is attributable only to the forged *indorsements*, the only preclusion is by the running of the three-year period. If the forged indorsement preclusion alone is applicable, the notification of the bank was timely with respect to a number of the checks. We conclude, however, that all of these checks are appropriately to be treated as altered checks or forged maker checks; and, accordingly, the three-year preclusion which would be applicable to a bona fide check which is not "properly payable" because of an indorsement forgery is irrelevant.

The Court of Appeals arrived at the same conclusion based on sec. 403.405(1), Stats.:

"An indorsement by any person in the name of a named payee is effective if:

". . . .

"(b) A person signing as or on behalf of a maker or drawer intends the payee to have no interest in the instrument . . . ."

The Court of Appeals reasoned:

"Because the forger of the checks [Doris Britton], upon which the indorsements were forged, intended the payee to have no interest in the checks, an indorsement by any person was effective. Thus, the loss occurred not from the assumed negligence of the bank in failing to examine the checks for proper indorsements because *any* indorsement was effective." 92 Wis.2d 784, 796, 285 N.W.2d 899 (Ct. App. 1979).

Accordingly, the Court of Appeals concluded that the cause of the loss was not the forged indorsement, which the Court of Appeals deemed to be effective, but was rather the result of the forged maker's signature—in respect to which Winkie, Inc., was precluded from asserting a claim by sec. 404.406(1) and (2), Stats.

We reach the same result by a different, though related rationale. As did the Court of Appeals, we conclude that the loss was occasioned by the failure of the cus-

tomer to report forged or altered checks. However, under the rationale which we adopt, whether or not the indorsement is effective in respect to the relationship of the customer to a bank becomes irrelevant, although it has obvious relevance to the drawee bank's relationship with collecting banks.

The rationale which we adopt is set forth in Donald W. Baker, *The Perini Case: Double Forgery Revisited (Part II)*, 11 Uniform Commercial Code Law Journal 41, at 54–6 (1978). Therein, Professor Baker states:

"The conclusion that in double forgery situations the plaintiff-drawer or drawee suffers no loss attributable to the forged indorsement because no payee can appear with a rightful claim can be explained as follows: In a single forgery situation in which only the indorsement is forged, the drawer will have validly drawn the check intending the named payee to receive the proceeds in exchange for some consideration given by the payee. When a thief steals the check and forges the payee's indorsement, the payee of course does not receive the proceeds. The thief passes the check to a collecting bank, which forwards it to the drawee, which in turn pays it and debits the drawer's account. At the time the theft is discovered, all parties except the payee are in a neutral position: The collecting bank has paid the forger, but has been paid in turn by the drawee; the drawee has paid the collecting bank, but has in turn debited the drawer's account; and the drawer has lost the amount from his account, but has received the consideration from the payee. Only the payee, who has given consideration but has not received the proceeds, is in a negative position. The payee has the ability to make himself whole either by recovering against the drawer on the underlying transaction or by recovering against the drawee for conversion. Thus, the loss suffered by the drawer or drawee can be attributed to the forged indorsement, in the sense that the theft and forgery resulted in the appearance of a payee with a rightful claim.

"By contrast, in double forgery situations the drawer's signature, as well as the indorsement, is forged, mean-

ing that the check was never validly drawn to a payee entitled to payment. Hence, no true payee can appear with a claim against the drawer or drawee, and neither of the latter parties can be said to suffer a loss attributable to the forged indorsement. Rather, the loss results from the drawee's making payment over a forged drawer's signature where none was intended by the drawer.

"In the double forgery situation, the loss initially falls on the drawer, whose account was debited. The possible claims that may be made in an effort to shift the loss, and the effects of the loss-causation rationale adopted by the *Perini* court on them, are as follows: First, unless precluded from recovering against the drawee by negligence, ratification, or an agreement to hold the drawee harmless, the drawer is entitled to demand a recredit on the basis of the forged drawer's signature. Since this right is enforceable irrespective of the status of the indorsement, the loss suffered by the drawee upon giving the recredit cannot be attributed to the defective indorsement. Nor can it be attributed to the claim of a payee. Thus, the loss-causation rationale applies."

The same rationale, stated somewhat differently, appears in John D. O'Malley, *Common Check Frauds and the Uniform Commercial Code,* 23 Rutgers Law Review 189, at 247 (1969). Therein, Professor O'Malley writes:

"Since the drawer whose signature is forged was not meeting any obligation to the payee, and the payee was not entitled in the first instance to an instrument drawn in the drawer's name, the drawee bank could not be compelled by the payee to pay again. Thus, the drawee bank's loss results not from making payment to the wrong person because of a forged indorsement, but from making any payment at all on the basis of a forged drawer's signature." *See also* O'Malley, *The Code and Double Forgeries,* 19 Syracuse Law Rev. 36, 37.

Thus, because the loss is attributable to the forged maker's signature, it becomes irrelevant in the instant case to determine, as did the trial court, that Heritage Bank was not negligent in its failure to inspect for

indorsements or whether, as the Court of Appeals assumed *arguendo,* the failure to inspect for indorsements was negligence. Under the facts of this case we are not obligated to concern ourselves with whether or not the bank was negligent in that respect. We do not pass upon the question.

One check in the hundreds of the Britton-forgery series appears to be an aberration in that the check, naming Lyle Britton as payee, was transferred without indorsement and came to the drawee-bank, Heritage, for payment bearing on its back the stamp of a collecting bank, "Pay Any Bank, Prior Endorsements Guaranteed." Under normal circumstances the general rule that a drawee-bank may not with impunity debit its customer's account for a check bearing a forged indorsement applies equally where indorsement is missing. *See, e.g.,* Bailey, *Brady on Bank Checks,* sec. 23.2, p. 23–4. Under the unusual circumstances in the present case, however, we conclude that the missing indorsement was immaterial to Winkie, Inc.'s loss and is not a ground for recovery.

A drawee-bank which pays a check unindorsed by the named payee may properly debit its customer's account in the amount of the check if the collecting bank has "supplied" the missing indorsement by imprinting on the check, "Credited to the account of the named payee absence of indorsement guaranteed," or similar words (*see* sec. 404.205(1), Stats.; *Bowling Green, Inc. v. State Street Bank and Trust Co.,* 425 F.2d 81, 84 (1st Cir. 1970)), and if the named, intended payee actually received the proceeds. *Brady on Bank Checks, supra,* sec. 12.7, pp. 12–14 to 12–15; *id.* sec. 15.5, pp. 15–11 to 15–13. Moreover, even absent the collecting bank's "supplying" the missing payee-indorsement, the drawee-bank is protected against a claim by its customer, the drawer, as long as the proceeds reach the named payee intended by

the drawer to receive them. *First National Bank of Gwinnett v. Barrett,* 141 Ga. App. 161, 233 S.E.2d 24, 94 B.L.J. 864 (1977).[10]

In the present case, the unindorsed check, like all the others, bore a forged maker signature. Thus no payee actually intended by Winkie, Inc., to receive the proceeds existed, and none could come forward to make a claim. Under the rationale stated above as to doubly-forged checks, the controlling defect in this check was therefore the maker-forgery, and claim based thereon is, as already discussed, precluded. *See Perini Corp. v. First Nat. Bank of Habersham County,* 553 F.2d 398, 413–14 (5th Cir. 1977).

Moreover, the unindorsed check was not issued until August 31, 1970, five years after Doris Britton's scheme had begun. By that time she had defrauded Winkie, Inc., innumerable times by all three means used—alterations, forged maker-signatures, and bogus indorsements. We

---

[10] In *Perini Corp. v. First Nat. Bank of Habersham County,* 553 F.2d 398 (5th Cir. 1977), the court stated that, where missing or formally incomplete indorsements are concerned, bank liability under the U.C.C. is properly limited to the situation in which the intended payee did not receive the proceeds. *Id.* at 412–13. The court acknowledged that, in *First National Bank of Gwinnett, supra,* and similar cited cases (unlike *Perini* and the present case), the intended payee *did* receive the proceeds in accord with the bona fide drawer's true intent; thus, forcing a bank to reimburse the drawer in those cases because of the missing or incomplete indorsement would have resulted in a windfall to the drawer. The court, however, found that *First National Bank of Gwinnett* and its brethren were founded equally on the principle that the losses claimed by the drawer were not related to the defective indorsements. Thus it held that at least in cases like *Perini* and the present case, where the defectively indorsed check also bears a forged *maker*-signature, the drawee-bank's liability is properly limited to claims raised in the name of a *true* payee. Upon the facts in the present case, as in *Perini,* "there is no possibility that a true payee will demand payment and subject [the bank] to dual liability." *Perini, supra,* at 413–14.

have already held that any claim by Winkie, Inc., based on alterations or forged maker-signatures was barred subsequent to a period beginning fourteen days after the bank put Winkie, Inc., on notice of the first forgery by mailing the statement and cancelled checks. *Brady, supra,* intimates that, in this multiple-wrongdoing situation, even claims based on subsequent defective *indorsements* are barred by the fourteen-day preclusion. *See id.,* sec. 26.13, pp. 26–26 to 26–27. Further, there is no evidence in the record to support an inference that, even had the bank questioned this check, the scheme would have been uncovered and losses halted. As discussed, Winkie, Inc.'s accounting and control as to bank statements were lax. Lyle Britton himself, the named payee, was in charge of handling statements and was unsupervised by W. J. Winkie, Jr. It is unclear how the bank, if it had discovered the missing indorsement, would have notified the company and who within the company would have been responsible for responding thereto.[11]

Under the circumstances such an argument, as the *Perini* court noted in response to a similar contention, is of no avail.[12]

---

[11] That the scheme would have been discovered and halted as a result of bank inquiry into this particular check is especially speculative in light of the fact that the record is consistent with an inference that Lyle himself, the named payee, may have handled the check. Although it was stipulated that the *proceeds* of all checks ultimately inured to Doris Britton's benefit, the record reveals that, of the many checks she made out to Lyle Britton, *not* all were falsely *indorsed* by her. At least three of the checks made out to Lyle Britton as payee were *properly* indorsed by him. For all the record shows, Lyle himself may have handled the check made out to him but lacking his indorsement. Thus, any bank inquiry may have resulted only in the formalism of Lyle's confirming to the bank that he, as named payee, had in fact transferred the check.

[12] "Perini [the drawer] argues that if someone in the collection process had returned the check for proper indorsement, something might have happened in the interim to prevent the loss it

We conclude that the customer, Winkie, Inc., was not entitled to recover on any of the checks.

*By the Court.*—Decision affirmed.

CALLOW, J., took no part.

did suffer. The argument is of no avail. It could have applied to drawers in all the missing or incomplete indorsement cases discussed above." *Perini, supra,* 553 F.2d at 413-14.