771 F.2d 154
 54 USLW 2160, 41 UCC Rep.Serv. 1573
 NATIONAL CREDIT UNION ADMINISTRATION, Plaintiff-Appellant
(84-1112, 84-1163), Cross-Appellee (84-1162),
v.
MICHIGAN NATIONAL BANK OF DETROIT, Defendant-Appellee
(84-1112), Cross Appellant (84-1162),
Security Bank and Trust Co., Defendant-Appellee (84-1163).
 Nos. 84-1112, 84-1162 and 84-1163.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 7, 1985.
Decided Aug. 27, 1985.
 
 Richard K. Willard, J. Christopher Kohn, Robert M. Hollis, Mark D. Friedman, Civil Div., Dept. of Justice, Anthony J. Steinmeyer, Mark B. Stern (argued), Washington, D.C., for plaintiff-appellant.
 F. Philip Colista, Colista, Green & Adams, Detroit, Mich., Charles A. LeFevre, Columbo & Columbo, Birmingham, Mich., Todd J. Mikesells (argued), Harry F. Vellmure, Sec. Bank & Trust, Allen Park, Mich., John R. Spreitzer (argued), Clawson, Mich., Paul J. Schwab, Davidson, Gotschall, Kohn, Secrest, Wardly, Lynch and Clark, Farmington Hills, Mich., Alan Goldstein, Goldstein, Goldstein and Bershad, Southfield, Mich., Jack C. Chilingirian, Mount Clemens, Mich., Phil Ruggeri, Sterling Heights, Mich., John F. Milan, Harvey, Kruse, Westen and Milan, Detroit, Mich., for defendant-appellee.
 Before KEITH and MARTIN, Circuit Judges; and PHILLIPS, Senior Circuit Judge.*
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This appeal requires us to determine the appropriate analysis for allocating loss on a check that bears a forged drawer's signature and also lacks the indorsement of the named payee. We approve and adopt the rationale developed by the Fifth Circuit in Perini Corp. v. First National Bank, 553 F.2d 398 (5th Cir.1977).
 
 
 2
 This controversy arose out of a scheme in which employees of the Spot Credit Union conspired to defraud Spot out of approximately two million dollars. Spot was a nonprofit corporation chartered by the State of Michigan and located in Wayne County. Joseph Snyder obtained a full-time position in the loan department at Spot in 1978. Shortly thereafter he initiated a scheme with other Spot employees and two used car salesmen, William Majewski and Robert Rochelle, in which Snyder promised to provide buyers and financing for as many cars as Majewski and Rochelle could supply.
 
 
 3
 The plan was straightforward. At Snyder's direction, Spot made car loans to individuals who were not members of Spot and who did not meet the credit union's loan standards. Once a loan had been approved, Snyder used Spot's check signing machine to apply Spot's corporate facsimile signature to the loan checks. In return for the check, Spot received the loan note and a security interest in the car to be purchased. The payee of the check would then take the check to Majewski and Rochelle, who would give the payee a car in return for the check. Some of the checks were then taken by Rochelle and deposited into his account at Security Bank and Trust Company and then forwarded by Security to Michigan National Bank of Detroit, where Spot had its account. Other checks were taken by Majewski and deposited into his account at Michigan National. For his trouble, Snyder received a $1,000 kickback for every car sold by Majewski and Rochelle as part of the scheme.
 
 
 4
 In all, the scheme generated over five hundred loans. Spot became insolvent as a result of the defalcation and the National Credit Union Administration, which had insured the depositors' accounts, arranged the merger of Spot with another credit union. As part of the merger agreement, the Credit Union Administration was assigned the notes and loans that resulted from the fraud.
 
 
 5
 Only sixty-nine of the over five hundred checks generated by the fraudulent scheme are at issue here. Sixty-five of the checks were made out to real payees who received cars from Majewski and Rochelle. These sixty-five checks were not indorsed by the named payee but were indorsed by Majewski or Rochelle and deposited into an account at either Security or Michigan National. Four of the checks were made out to a fictitious payee. These checks were not indorsed in the name of the named, fictitious payee but were indorsed by Majewski and deposited into his account at Michigan National. All sixty-nine checks were accepted by Michigan National, and Spot's account was debited approximately $375,000.
 
 
 6
 The Credit Union Administration brought this action against the employees and the car dealers for the total amount of the fraud and against Security and Michigan National for improper payment of the sixty-nine checks. The Credit Union Administration moved for summary judgment, as to liability, against Michigan National. Michigan National filed a cross-motion for summary judgment against the Credit Union Administration, and Security was permitted to participate in the argument on the motions. The district court awarded summary judgment to Michigan National on the sixty-five checks made payable to real payees and to the Credit Union Administration against Michigan National on the four checks made payable to fictitious payees. On the basis of its summary judgment in favor of Michigan National, the court entered summary judgment in favor of Security. Finally, the claims against both Michigan National and Security were dismissed with prejudice. The parties then perfected these appeals.
 
 
 7
 This case should be decided in accordance with the provisions of the Uniform Commercial Code.[1] With respect to the sixty-five checks made out to real payees, the Credit Union Administration invokes the general rule that a drawee bank is liable for paying an item with a missing indorsement because the item is not "properly payable." This general rule is the product of reading several sections of the Code together. Section 4-401 states that a bank may charge only "properly payable" items against its customer's account. Section 3-202(1) states that a transferee of a check becomes a holder by negotiation which, in the case of a check made payable to order, is accomplished by "delivery with any necessary indorsement." Section 3-504(1) states that a check may be presented for payment only by a holder. A drawee who pays an item that lacks a necessary indorsement may shift the loss backward in the chain of collection by a claim for breach of warranty against the collecting banks pursuant to sections 3-417(1)(a) and 4-207(1)(a).
 
 
 8
 Michigan National agrees with the Credit Union Administration's characterization of the general rule and also concedes that the sixty-five checks payable to real payees lacked the necessary indorsement. Michigan National asserts, however, that the checks also contained a forged drawer's signature, an assertion with which the Credit Union Administration agrees, although the Credit Union Administration does not assert liability for payment over the forged drawer's signatures. When a check contains a forged drawer's signature, the forgery does not operate as the ostensible drawer's signature, section 3-404(1), and the check therefore is not "properly payable," section 4-401. The drawee bank is prevented from asserting claims against collecting banks by virtue of the final payment rule of section 3-418.
 
 
 9
 The Code does not in terms state the appropriate analysis for allocating loss when a check bears a forged drawer's signature and lacks the indorsement of the named payee. This is a critical omission because, in addition to the difference in the drawee's ability to shift the loss to collecting banks, different limitations periods apply depending upon which analysis is used. See, e.g., section 4-406(1), (2), and (4). The question squarely presented by this case is whether checks bearing a forged drawer's signature and lacking the indorsement of the named payee should be treated as if they contained only the former or only the latter defect. The leading case is Perini Corp. v. First National Bank, 553 F.2d 398 (5th Cir.1977). Perini was exhaustively and convincingly analyzed in Baker, the Perini Case: Double Forgery Revisited (Part I), 10 U.C.C.L.J. 309 and Id. (Part II), 11 U.C.C.L.J. 41 (1978), and we need only outline the essential points.
 
 
 10
 In Perini, the court determined how to allocate loss in a case in which the drawer's signature was forged and the indorsement was both forged and failed to indicate representative capacity. To determine how to allocate loss when a check contains a forged drawer's signature and a defective indorsement, the court examined the rationales behind the Code's allocation of loss in single forgery cases. The traditional rationale for placing the loss on the drawee when a check bears a forged drawer's signature is the fiction that the drawee should be familiar with the drawer's signature and thus is in the best position to uncover the fraud. Id. at 405. The court doubted the validity of the first rationale and noted a second, more realistic basis for the rule of drawee liability:
 
 
 11
 [A] less fictional rationalization [is] that it is highly desirable to end the transaction on an instrument when it is paid rather than reopen and upset a series of commercial transactions at a later date when the forgery is discovered.
 
 
 12
 Id. (quoting section 3-418, Comment 1).
 
 
 13
 With respect to the Code's loss allocation scheme for a check that bears a forged indorsement, the court recognized the traditional rationale that depositary banks should bear the loss because they are in the best position to notice a flaw in the signature of the payee and to verify the credentials of the person depositing the check. Again, the court doubted the superior ability, under modern conditions, of the depositary bank to verify the payee's signature. Id. at 405. The court acknowledged that in the case of a single forgery a depositary bank may be in a superior position to check the credentials of the person making the deposit. When a double forgery is involved, however, the superior ability of the depositary bank is diminished:
 
 
 14
 Someone forging a check will likely draw the check to a payee whose identity he can readily assume, such as himself or a fictitious person. In such circumstances the party who first takes the check may well have no particular opportunity to detect any impropriety in the indorsement.
 
 
 15
 Id. at 406. The court concluded that, given the Code's policy in favor of finality and the diminished ability of the depositary bank to detect a forged indorsement when the check also bears a forged drawer's signature, a check bearing a double forgery should be treated like a check bearing only a forged drawer's signature.
 
 
 16
 This conclusion was bolstered by a separate but related rationale. This rationale, the so-called "loss-causation principle," is that in a double forgery situation no true payee can make a legitimate claim to the check, so any loss suffered by the drawer is attributable to the forged drawer's signature rather than the forged indorsement. Id. at 414-15. Professor Baker explains the loss-causation principle:
 
 
 17
 The conclusion that in double forgery situations the plaintiff-drawer or drawee suffers no loss attributable to the forged indorsement because no payee can appear with a rightful claim can be explained as follows: In a single forgery situation in which only the indorsement is forged, the drawer will have validly drawn the check intending the named payee to receive the proceeds in exchange for some consideration given by the payee. When a thief steals the check and forges the payee's indorsement, the payee of course does not receive the proceeds. The thief passes the check to a collecting bank, which forwards it to the drawee, which in turn pays it and debits the drawer's account. At the time the theft is discovered, all parties except the payee are in a neutral position: The collecting bank has paid the forger, but has been paid in turn by the drawee; the drawee has paid the collecting bank, but has in turn debited the drawer's account; and the drawer has lost the amount from his account, but has received the consideration from the payee. Only the payee, who has given consideration but has not received the proceeds, is in a negative position. The payee has the ability to make himself whole either by recovering against the drawer on the underlying transaction or by recovering against the drawee for conversion. Thus, the loss suffered by the drawer or drawee can be attributed to the forged indorsement, in the sense that the theft and forgery resulted in the appearance of a payee with a rightful claim.
 
 
 18
 By contrast, in double forgery situations the drawer's signature, as well as the indorsement, is forged, meaning that the check was never validly drawn to a payee entitled to payment. Hence no true payee can appear with a claim against the drawer or drawee, and neither of the latter parties can be said to suffer a loss attributable to the forged indorsement. Rather, the loss results from the drawee's making payment over a forged drawer's signature where none was intended by the drawer.
 
 
 19
 Baker, The Perini Case: Double Forgery Revisited (Part II), 11 U.C.C.L.J. 41, 55 (1978).
 
 
 20
 Some commentators have questioned the wisdom of the Perini holding and Professor Baker's analysis of it. See, e.g., Graybill, Reconsidering An Old Conundrum: The Case for Indorsement Liability in Double Forgeries, 83 Commercial L.J. 61 (1978); Note, 24 Wayne L.Rev. 1077 (1978). The courts, however, with whom we now join, have embraced Perini 's holding and Baker's analysis. See, e.g., Cumis Insurance Society, Inc. v. Girard Bank, 522 F.Supp. 414 (E.D.Pa.1981); Winkie, Inc. v. Heritage Bank, 99 Wis.2d 616, 299 N.W.2d 829 (Wis.1981); Payroll Check Cashing v. New Palestine Bank, 401 N.E.2d 752 (Ind.Ct.App.1980); Brighton, Inc. v. Colonial First National Bank, 176 N.J.Super. 101, 422 A.2d 433 (N.J.Super.Ct.App.Div.1980), aff'd, 86 N.J. 259, 430 A.2d 902 (N.J.1981).
 
 
 21
 The Credit Union Administration offers several reasons why the principle articulated in Perini should not be applied in this case. First, the Credit Union Administration argues that the degree of Michigan National's negligence in accepting the checks exceeds that of the drawee bank in Perini. Specifically, the drawee in Perini paid checks that bore indorsements that were forged and did not show representative capacity while Michigan National paid checks on which the indorsements of the named payees were altogether missing. Perini cannot be distinguished on that basis. Concededly, the depositary banks could readily determine that the checks lacked the indorsements of the named payees. Thus, our holding cannot rest on the Perini court's observation that in double forgery cases the depositary bank has no "particular opportunity to detect any impropriety in the indorsement." As we have indicated, however, an alternative rationale for treating double forgeries as if they bore only forged drawer's signatures is that the forged indorsement does not cause the drawer's loss.
 
 
 22
 The loss-causation rationale is poignantly illustrated by the facts of the present case. Spot suffered a loss of two million dollars on a total of over five hundred checks. All of those checks bore forged drawer's signatures, but only the sixty-nine checks at issue here, which represent only $375,000 of the loss, lacked the indorsement of the named payee. The presence or absence of a proper indorsement was not causally related to Spot's loss. Spot's loss was caused by the forged drawer's signatures, i.e., by the fact that no one, whether the person was real or fictitious or whether the indorsement was present, missing, forged, or defective, was entitled to payment on the checks. The Credit Union Administration should not be permitted to advance indorsement-related claims on the basis of the fortuitous circumstance that the hucksters failed to get proper indorsements from some of the named payees. Regardless of the degree of the drawer's negligence in accepting a check with a defective indorsement--regardless of whether the indorsement is forged, fails to show representative capacity, or is altogether missing--the defect does not cause the drawer's loss.[2] Causation, not negligence, is the lynchpin of the Perini rule. See Winkie, Inc. v. Heritage Bank, 299 N.W.2d at 838; Brighton, Inc. v. Colonial First National Bank, 422 A.2d at 440.
 
 
 23
 Next, the Credit Union Administration argues that the courts are without authority to create "exceptions" to the provisions of the Uniform Commercial Code. Section 3-405(1)(c) specifically contemplates the problem of defective indorsements in the context of checks issued by unfaithful employees, the argument goes, so we should not look beyond section 3-405 in allocating loss in the case of double forgeries.
 
 
 24
 Section 3-405, the so-called "fictitious payee rule," provides that "[a]n indorsement by any person in the name of a named payee is effective" if, inter alia, an employee of the drawer has supplied the drawer with the name of the payee intending the latter to have no interest in the check. If the requirements of section 3-405 are met, the loss caused by the forged indorsement is shifted from the drawee to the drawer. The Credit Union Administration argues that this Code-created exception to the general rule of drawee liability for payment over a forged indorsement is exclusive of all judicially developed exceptions. Because section 3-405 is the exclusive exception to the general rule of drawee liability and because none of the checks at issue were indorsed "in the name of a named payee," the Credit Union Administration concludes that Michigan National is liable for improperly paying the checks.
 
 
 25
 We do not believe that section 3-405 preempts application of the Perini rule in those instances in which the requirements of section 3-405 are not met. Indeed, a review of the official comments and examples that accompany the section makes evident that the drafters of section 3-405 were concerned primarily with cases of single forgery involving only forged indorsements. See Graybill, 83 Commercial L.J., supra, at 73-77. Section 3-405(1)(c) is a negligence-based rule that is designed in forged indorsement cases to place the loss on the employer-drawer when his or her failure to supervise employees enables an employee to carry out the fraudulent scheme. See section 3-405, Comment 4. The requirement of an indorsement "in the name of a named payee" is meant to prevent a shift of liability from the drawee to the drawer when the drawee negligently pays an instrument that does not bear a purportedly regular chain of indorsements. See section 3-405, Comment 1.
 
 
 26
 When applied to double forgeries, section 3-405 produces an anomalous result. Depositary banks and the drawee are shielded from liability on the forged indorsement because that indorsement is deemed "effective." Section 3-405 does not deem the drawer's signature "effective," however, so the ostensible drawer may recover against the drawee for payment over the forged drawer's signature. Loss rests with the drawee because the depositary bank is shielded by the final payment rule of section 3-418. It is difficult to believe that the drafters of section 3-405 intended liability to rest with the drawer when his or her negligence results in forgery of the indorsement but intended liability to rest with the drawee when the drawer's negligence results in forgery of the drawer's signature as well as the indorsement.
 
 
 27
 Of course, we have no occasion to conclude that courts have erroneously left open the possibility of drawee liability for forged drawer's signatures when the requirements of section 3-405 are met in double forgery cases. But we do not hesitate to conclude that the existence of section 3-405 and court decisions applying that section to double forgeries do not preclude us from looking beyond section 3-405 in allocating loss in double forgery cases when the requirements of that section are not met. See B. Clark, The Law of Bank Deposits, Collections and Credit Cards p 6.5 at 6-107 (rev. ed. 1981); Baker, 10 U.C.C.L.J., supra, at 341. In other words, assuming that section 3-405 is an appropriate means of allocating loss in double forgery cases, it is not an exclusive means.[3]
 
 
 28
 The district court properly rejected the Credit Union Administration's argument that section 3-405 provided the exclusive means for allocating loss on the sixty-five checks that were made payable to real payees. The court then applied section 3-405 to the checks made payable to fictitious payees and concluded that the section was not applicable because the checks, which lacked the indorsements of the named payees, did not bear "an indorsement by any person in the name of a named payee." Concluding that section 3-405 was inapplicable, the court entered judgment for the Credit Union Administration. Both parties agree that if the Perini rule applies to the sixty-five checks payable to real payees it applies as well to the four checks payable to fictitious payees. For the reasons that we have stated, the district court should have determined whether the four fictitious payee checks, because they also bore forged drawer's signatures, fell within the ambit of the Perini rule even though they did not fall within the narrow confines of section 3-405.
 
 
 29
 Application of the Perini rule requires that the four fictitious payee checks be treated as if they bore only forged drawer's signatures. Although the drawee is negligent in paying a check that lacks the indorsement of a named payee, the drawer's loss is caused by the forged drawer's signatures. The drawer did not intend payment to any payee, so no payee can appear and demand payment. The danger guarded against by the requirement of a proper indorsement is absent. It is irrelevant whether the payee is real or fictitious and whether the indorsement is forged, missing, or otherwise defective.
 
 
 30
 The Credit Union Administration argues that a Michigan case, Travco Corp. v. Citizen Federal Savings & Loan Association, 42 Mich.App. 291, 201 N.W.2d 675 (1972), forecloses application of Perini to the four fictitious payee checks. Even assuming that Michigan law applies,[4] we do not find Travco controlling. First, the Travco court stated that the faithless employee had "supplied the drawer with the names of fictitious payees." Thus, it does not appear that the court regarded the drawer's signature as forged. See Note, 24 Wayne L.Rev., supra, at 1082 n. 29 and 1092 n. 104. Second, assuming that Travco was a double forgery case and recognizing that the court prevented the drawee from invoking the protection of section 3-405 because the check was not indorsed in the name of a named payee, it does not appear that the Perini rationale was presented to or considered by the court. If the appropriate argument were presented to the Michigan courts, we are confident that they would follow the lead of Michigan's sister states and adopt the Perini rationale.
 
 
 31
 Finally, the Credit Union Administration argues that this case must be remanded to the district court for consideration of liability on the forged drawer's signatures. A theory of liability on the forged drawer's signatures was neither set out in the complaint nor presented to the district court during the course of the litigation. In its brief in support of its motion for summary judgment, the Credit Union Administration stated in a footnote, "If this motion is not granted, we, of course, reserve the right to assert that [Michigan National] is liable under Sec. 3-404(1) and 4-404(1) of the Code for honoring checks with a forged drawer's signature." The Credit Union Administration overlooks the fact that Michigan National's cross-motion for summary judgment was pending when the Credit Union Administration "reserved" its argument on liability for the forged drawer's signature. To avoid summary judgment against it, the Credit Union Administration was obliged to come forward with every legal theory and all facts necessary to establish that a material issue of fact existed that would preclude summary judgment in favor of Michigan National. See Fed.R.Civ.P. 56(e); Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1163-64 (5th Cir.1983). The Credit Union Administration cannot now request a remand to enable it to assert a theory of recovery that it expressly refused to assert in opposition to Michigan National's motion for summary judgment.[5]
 
 
 32
 The judgment of the district court is affirmed in part and reversed in part. The parties will bear their own costs of this appeal.
 
 
 
 *
 The Honorable Harry Phillips concurred in this opinion prior to his death on August 3, 1985
 
 
 [1]
 This case was properly brought in the district court pursuant to the court's federal question jurisdiction. See 12 U.S.C. Sec. 1789(a)(2). We do not find it necessary to determine whether the Michigan Commercial Code and the Michigan courts' interpretations thereof or the Uniform Commercial Code as supplemented by federal common law, see United States v. Burnette-Carter Co., 575 F.2d 587, 589-90 (6th Cir.), cert. denied, 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978), controls the result in this case. Michigan has adopted without modification the relevant portions of the Uniform Commercial Code and no Michigan case requires a result contrary to the one which we reach
 
 
 [2]
 Michigan National argues that with respect to the sixty-five checks made payable to real payees, no payee could assert a claim against the drawer because the payees, who received cars in return for the checks, effectively received the proceeds of the checks. We adopt the more narrow view that no payee could assert a claim against the ostensible drawer because the drawer's signature was forged; no payee could be entitled to payment from the ostensible drawer because the ostensible drawer intended payment to no payee. Thus, our holding in this case is limited to cases in which the check bears a forged drawer's signature
 
 
 [3]
 We obviously reject the view that the decision in Perini rested in any essential way on application of section 3-405. Rather, Perini rested on an examination and application of the fundamental rationales that lay behind the Code's treatment of single forgeries. See generally Baker, 11 U.C.C.L.J., supra, at 46-56
 
 
 [4]
 See supra note 1
 
 
 [5]
 At no point in the proceedings has the Credit Union Administration articulated a negligence or restitutionary claim against Security (or Michigan National in its capacity as a depositary bank) on the basis of the forged drawer's signatures, and remand for consideration of those claims is not appropriate. We therefore need not consider whether the finality and loss-causation rationales would permit the depositary banks to invoke the protection of section 3-418 even though the absence of indorsements prevents the banks from becoming "holders," see section 1-201(20). See generally Baker, 11 U.C.C.L.J., supra, at 62-64